IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| THOMAS L. SLUMAN, a single person, | ) | |
| | ) | No.  34467-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF WASHINGTON, by and | ) | PUBLISHED OPINION |
| through the WASHINGTON STATE | ) | |
| PATROL; BART H. OLSON, individually | ) | |
| and in his official capacity as a TROOPER | ) | |
| of the WASHINGTON STATE PATROL; | ) | |
| and JANE/JOHN DOE I-X, individually | ) | |
| and as Employees/Agents of the | ) | |
| WASHINGTON STATE PATROL | ) | |
| and/or the STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, J. — In common parlance, a door check is an attachment used to close a door and prevent its slamming.  In ice hockey, the term "check" or "checking" refers to a defensive move whereby the defenseman moves his body into an opposing player in order to disrupt the opponent's possession of the puck.  This lawsuit gives rise to a new meaning to the expression "door check" or "door-check," an import presumably derived from hockey.

In this appeal, we address the tort liability of a law enforcement officer, to an injured motorcyclist, when the officer purposely opens his patrol car door so that the door strikes and stops the speeding cyclist. Law enforcement refers to the officer's tactic as door-checking. The defendant officer and other officers pursued the motorcyclist because of his speeding. In resolving the appeal, we ask whether some facts support a ruling that the law enforcement officer seized the motorcyclist within the meaning of the United States Constitution's Fourth Amendment, and, if so, whether the officer warrants qualified immunity from civil liability. We also ask whether the officer and his employer gain immunity from state law claims under Washington's felony bar statute. The trial court granted the officer and his employer summary judgment. We reverse.

FACTS

The statement of facts arises from deposition testimony and from affidavits in support of and in opposition to summary judgment motions filed by defendants State of Washington and Washington State Patrol Trooper Bart Olson. Because the trial court granted the motions and dismissed plaintiff and motorcyclist Thomas Sluman's claims, we view the facts in a light favorable to Sluman.

On the sunny morning of Wednesday, July 21, 2010, Thomas Sluman, a Port Angeles denizen, rode his motorcycle eastbound on Interstate 90 in lower Kittitas County ten miles west of Ellensburg. On that same morning, Washington State Patrol Trooper John Montemayor piloted the aircraft "Smokey 6" and patrolled traffic from the craft.

2

An aerial patrol officer employs a series of white stains, known as aerial traffic surveillance marks, painted on the road at half-mile intervals to measure the speed of vehicles. The officer gauges the speed of a vehicle with a stopwatch as the vehicle travels between marks. Trooper Montemayor, by using the surveillance marks, measured Sluman as traveling between seventy-six and eighty-nine miles per hour on the seventy miles per hour interstate. Montemayor radioed Trooper David Hinchliff, who patrolled on the ground, to stop and cite Sluman. Trooper Hinchliff's patrol car parked facing northbound on Thorp Highway near Interstate 90 exit 101, the location of Thorp Fruit and Antique Mall.

Thomas Sluman left Interstate 90 at exit 101. Sluman stopped at the stop sign at the end of the off-ramp, activated his motorcycle's right turn signal, and turned right onto South Thorp Highway. According to Trooper David Hinchliff, Sluman did not turn his head to the left to see Trooper David Hinchliff's patrol car before Sluman turned right. According to Sluman, he looked to the left and saw the patrol car, but the car faced the opposite direction.

South Thorp Highway mainly travels east and west, but south of Interstate 90. Trooper Hinchliff performed a U-turn on Thorp Highway, activated his overhead lights, and radioed dispatch to notify it that he would pursue Sluman. After radioing dispatch, Hinchliff activated his siren and chased Sluman on South Thorp Highway. Sluman never saw Hinchliff reverse directions in order to pursue him.

Trooper David Hinchliff soon lost sight of Thomas Sluman because the two-lane South Thorp Highway frequently curves. From Interstate 90 exit 101, the highway runs five miles before it again crosses the interstate at exit 106, the western exit for Ellensburg. Trooper John Montemayor eyed Sluman from the air while maintaining contact with Hinchliff. From his vantage point, Trooper Montemayor estimated Sluman reached a speed over one hundred and twenty miles per hour. Sluman disputes this speed approximation because South Thorp Highway lacks aerial traffic surveillance marks, but Sluman does not testify as to his speed. While riding on Thorp Highway, Sluman obeyed all traffic laws except the speed limit. Sluman never looked behind him to see Trooper Hinchliff in pursuit. Hinchliff concluded that he did not need to pursue Sluman at a high rate of speed, since the air patrolman followed Sluman.

Washington State Trooper Bart Olson also patrolled, in a Dodge Charger, along Interstate 90 near exit 101 on the morning of July 21, 2010. Trooper Olson had just completed a traffic stop, when he overheard Trooper David Hinchliff notify dispatch about Hinchliff's pursuit of Thomas Sluman. Olson unilaterally joined the pursuit by traveling eastbound on Interstate 90, not on South Thorp Highway.

A Washington State Patrol regulation prohibits a trooper from unilaterally joining a suspect's pursuit. Troopers may join a pursuit only when requested by the first officer in pursuit or when directed by a supervising officer. The State Patrol adopted this regulation because pursuits pose as one of the riskiest actions that a law enforcement

4

officer undertakes. Trooper Bart Olson denies that he pursued Thomas Sluman since

Olson did not chase Sluman on South Thorp Highway. Nevertheless, State Patrol rules

consider an officer as pursuing the suspect, even if the trooper does not chase the suspect

from behind, if the trooper acts to intercept or stop the pursued driver.

In his haste, Trooper Bart Olson passed another patrol officer, Trooper Paul

Blume, on Interstate 90. Blume drove a sports utility vehicle (SUV). Trooper Olson then

received instruction to end his pursuit since Trooper John Montemayor followed Thomas

Sluman from the air. Olson ignored the instruction and proceeded to Interstate 90 exit

106 where Olson anticipated he could intercept Sluman on South Thorp Highway.

After Olson exited Interstate 90, he turned right on South Thorp Highway and

journeyed in the opposite direction of Sluman and Trooper David Hinchliff. Olson then

saw Sluman's motorcycle rounding a corner in the oncoming lane. According to Olson,

"nobody was in the area." Clerk's Papers (CP) at 535. Trooper Olson drove his patrol

car across the centerline of the road, quickly braked, and parked his car, while straddling

the center line, on a bridge across the Yakima River, with the car's emergency lights

activated. Trooper Olson explained his intent:

> And, anyway, the motorcyclist was coming at me. And I could see
> the speed of the motorcycle, which was at a high rate, rapidly slowing. . . .
> I'm going to place this person in custody or worst [sic]—you know, I'm
> going to place him in custody, do a felony-style stop, or they're going to be
> going slow enough that if it comes down to it I'm going to basically horse
> collar this person off the motorcycle and end this pursuit, so that they don't
> end up with serious injuries, kill themselves, kill an innocent party.

CP at 532. After Trooper Olson parked, Trooper Paul Blume pulled behind Trooper Olson's patrol car and blocked more of the road.

The Washington State Patrol does not authorize a state trooper to tackle, horse collar, or otherwise physically remove a driver from a motorcycle. State Patrol personnel deem such a maneuver to be unwise and unsafe. State Patrol regulations do not permit a trooper to drive patrol cars into the lane of oncoming traffic or to park in the middle of the road. Under a State Patrol regulation, a roadblock occurs when officers position one or more vehicles or other obstructions across a roadway in order to prevent the escape of a fleeing vehicle. The regulation requires any roadblock to afford an "escape route" for the suspect. CP at 246, 662. State Patrol rules allow a roadblock only with supervisory approval and only when law enforcement seeks to apprehend the suspect for homicide, assault with intent to kill, rape, robbery in the first degree, or prison escape. Trooper Olson lacked supervisory approval for blocking the road and law enforcement did not pursue Thomas Sluman for any of the requisite crimes. Olson insists that he allowed space for Sluman to steer around his patrol car.

According to Thomas Sluman, he traveled sixty miles an hour as he rounded a curve on South Thorp Highway into the straightaway across the Yakima River Bridge. Sluman applied his brakes because he saw lights and vehicles on the bridge. He did not know that one or more of the cars were police cars. He intended to stop near the cars.

6

After he rounded the curve, he did not accelerate. Suddenly a sports utility vehicle entered his lane.

As Trooper Bart Olson remained parked in the middle of South Thorp Highway, he observed Thomas Sluman's motorcycle rapidly slow. Sluman probably then traveled between thirty-one and thirty-seven miles per hour. As Sluman slowed, he steered his motorcycle to the right and away from the highway's centerline in order to pass Trooper Olson's vehicle. According to Trooper Paul Blume, Sluman appeared to be stopping his motorcycle. As Sluman attempted to pass, Olson opened his patrol car door into the oncoming lane where Sluman traveled. The parties refer to Olson's maneuver as "door-checking." In his investigation report, Olson did not volunteer that he purposely opened the door to cause the door to strike Sluman. Trooper Olson's open door struck Sluman's motorcycle and propelled Sluman over the Yakima River Bridge to the ground thirty feet below and into a campground. A video captured Sluman crossing the Yakima River Bridge, Olson opening his patrol car door, and Sluman driving by the side of the door.

During a deposition, Thomas Sluman testified that he only remembered encountering a sports utility vehicle. According to Sluman, the SUV drove toward him in his lane and struck him.

Washington State Patrol regulations consider intentional intervention to be the act of ramming or hitting another vehicle with a patrol car in order to damage or force another vehicle off the road. During discovery in this suit, State Patrol personnel

7

confirmed that a trooper driving his car into the oncoming lane of traffic on a two-lane road with a suspect approaching constitutes the use of intentional intervention. The State Patrol equates intentional intervention with lethal force. Intentional intervention should only be used as a last resort to apprehend a suspect. Intentional intervention should also be used only when the officer knows or has reasonable grounds to believe the suspect committed or is attempting to commit a crime that poses a threat of death or serious bodily injury.

A State Patrol regulation declares that intentional intervention "shall not be used to apprehend a traffic offender, misdemeanant, or fleeing felon whose only felony is attempting to elude a pursuing police vehicle." CP at 662. The regulation further reads that an officer "attempting intentional intervention with a vehicle shall be held to the same standards as are applied to any other use of lethal force." CP at 662.

When Thomas Sluman hit the ground, he lost consciousness. After Sluman regained cognizance, but before receiving treatment for his injuries, Trooper Bart Olson asked Sluman why he fled from the police. Sluman answered that he had outstanding arrest warrants. An audio recording captured Sluman's response. Sluman admits he uttered the response, but he denies his statement to be correct. According to Sluman, he had outstanding warrants but he did not flee the police pursuit particularly since he knew not of the pursuit. When responding to Bart Olson's question, Sluman lay on the ground in severe pain.

8

As a result of the collision with the patrol car door and descent into the campground, Thomas Sluman sustained fractures of the tibia and fibula of his right leg, pubic bone, tailbone, and left elbow. The tibia and fibula breaks required multiple surgeries to implant and replace hardware and to graft skin and muscle. Sluman spent one year in a wheelchair while recovering. He suffered permanent physical impairments.

Thomas Sluman later entered an *Alford* plea to charges of attempting to elude a police vehicle. According to Sluman, he entered the plea because he wanted to end the prosecution because he still recovered from injuries.

PROCEDURE

Thomas Sluman filed suit against Washington State Patrol Trooper Bart Olson and the State of Washington. Sluman asserted a federal cause of action for a civil rights violation and state law causes of action for false arrest, false imprisonment, negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent training and supervision. He asserted the latter claim only against the State. Sluman alleged that Trooper Olson at all times relevant to the suit acted within the scope of his employment with the State of Washington.

In response to the civil rights cause of action, the State of Washington pled the defense of Eleventh Amendment immunity and Olson pled the defense of qualified immunity. Both the State and Olson raised the felony bar statute in defense of Thomas

9

Sluman's state law claims. The State agreed in its answer that Trooper Bart Olson acted within the scope of his employment at all times.

The State of Washington and Bart Olson moved for summary judgment. In response, Thomas Sluman agreed to dismissal of claims for false arrest and false imprisonment. The trial court granted summary judgment and dismissed all remaining claims.

LAW AND ANALYSIS

Civil Rights Cause of Action

Thomas Sluman asserts a civil rights claim under 42 U.S.C. § 1983 against the State of Washington and Trooper Bart Olson, and the trial court dismissed the claim against each defendant. Sluman only appeals the dismissal of the claim against Olson. Therefore, we do not address the merits of a civil rights claim against the State. The appeal of this dismissal centers on whether Trooper Olson seized Sluman and imposed excessive force within the meaning of the Fourth Amendment and whether Olson qualifies for qualified immunity under the federal civil rights statute, 42 U.S.C. § 1983.

42 U.S.C. § 1983, an often employed, but rarely quoted, statute reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

10

Section 1983 is not itself a source of substantive rights. *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Section 1983 only fulfills the procedural or remedial role of authorizing the assertion of a claim for relief. *Graham v. Connor*, 490 U.S. at 393-94. The pleader must also allege an independent substantive basis for his claim, whether grounded in a federal constitutional or a statutory right. *Nabozny v. NCS Pearson, Inc.*, 270 F. Supp. 2d 1201, 1205 (D. Nev. 2003). Thomas Sluman contends Trooper Bart Olson employed excessive force when blocking the path of his motorcycle and thereby violated the United States Constitution's Fourth Amendment.

42 U.S.C. § 1983 admits no immunities. The United States Supreme Court, however, has, based on common law and policy grounds, crafted immunities shielding government officials and employees from personal liability for damages. We will address available immunities later.

*Issue 1: Whether Thomas Sluman presents facts to establish that Washington State Trooper Bart Olson seized Sluman?*

*Answer 1: Yes.*

We first address whether facts support a conclusion that Trooper Bart Olson infringed Thomas Sluman's Fourth Amendment rights. In doing so, we view the facts in the light most favorable to the party asserting the injury, Sluman. *Saucier v. Katz*, 533

U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Since Sluman sues under the

federal civil rights statute and since he relies on the United States Constitution, we

examine only federal cases.

The Fourth Amendment protects "[t]he right of people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures." We

first determine if Trooper Bart Olson seized Thomas Sluman and later decide whether the

seizure was reasonable. Olson denies any seizure and characterizes his conduct as

reasonable as a matter of law.

Trooper Bart Olson impeded the travel of Thomas Sluman when Olson door-

checked Sluman's motorcycle. Whenever an officer restrains the freedom of a person, he

or she seizes that person for purposes of the Fourth Amendment. *Tennessee v. Garner*,

471 U.S. 1, 7, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). Seizure occurs when the

government official intentionally terminates a suspect's freedom of movement. *Brower*

*v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989).

*Brower v. County of Inyo* informs our decision. William Brower died after the

stolen car he drove at high speeds in an effort to elude pursuing police crashed into a

police roadblock. The United States Supreme Court held that law enforcement seized

Brower, within the meaning of the Fourth Amendment, by placement of the roadblock.

Contrary to the Court of Appeals' holding, the high Court explained that Brower's

opportunities to stop the vehicle prior to impact did not preclude violation of the Fourth

Amendment. The Court explicated:

> [A] roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur. It may well be that respondents here [law enforcement officers] preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent. Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (e.g., one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (e.g., one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

*Brower v. County of Inyo*, 489 U.S. at 598-99 (internal citations omitted).

In a footnote in his brief, Trooper Bart Olson denies that he established a roadblock. But he presents no argument or case law to the contrary. Looking at the facts in the light most favorable to Thomas Sluman and accepting his version of the facts, we conclude Trooper Olson orchestrated a roadblock.

Trooper Bart Olson's own deposition testimony suggests he implemented a roadblock. Olson explained his intent for driving across the centerline of the road and parking in the middle of the bridge as placing Sluman in custody by stopping him or

13

horse collaring him.  Trooper Olson stationed his patrol car to achieve the result of stopping Sluman's travel.  Olson's supervisor testified that Trooper Olson created a roadblock.

Trooper Bart Olson highlights that a semi-tractor trailer could have squeezed on either side of his patrol car parked on the Yakima River Bridge.  But this emphasis ignores important facts, including his own testimony that he opened his car door at the last moment in order to impede Thomas Sluman's progress.  He intended a roadblock and effectuated this intent.  Any opportunity by Sluman to steer clear of the door does not preclude application of the Fourth Amendment.

We also do not consider the question of whether Trooper Bart Olson erected a roadblock as controlling.  A Fourth Amendment seizure does not require use of a roadblock.  For example, a police officer's fatal shooting of a fleeing suspect constitutes a Fourth Amendment seizure presumably because the death impedes the suspect's movement.  *Tennessee v. Garner*, 471 U.S. at 7 (1985).  Even assuming Olson employed no roadblock, he, like the officers in *Brower v. County of Inyo* and *Tennessee v. Garner*, employed means to stop the movement of Thomas Sluman.

*Issue 2: Whether Thomas Sluman presents facts of an unreasonable seizure?*

*Answer 2: Yes.*

Seizure alone does not violate the Fourth Amendment.  The amount of force used to effect the seizure must be unreasonable to amount to a constitutional violation.

14

*Brower v. County of Inyo*, 489 U.S. at 599 (1989). Courts analyze a claim of excessive force in the course of making a seizure of a person under the Fourth Amendment's "objective reasonableness" standard. *Ashcroft v. al-Kidd*, 563 U.S. 731, 736, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011); *Graham v. Connor*, 490 U.S. at 388 (1989). In assessing the reasonableness of the manner of a seizure, courts balance the nature and quality of the intrusion on the individual's liberty interest against the importance of the governmental interests alleged to justify the intrusion. *Graham v. Connor*, 490 U.S. at 396. Courts examine the government interest in safely effecting an arrest in light of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively resists arrest or attempts to evade arrest by flight. *Graham v. Connor*, 490 U.S. at 396. Even when some force is justified, the amount actually used may be excessive. *Santo v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

Determining whether a police officer's use of force was reasonable or excessive requires careful attention to the facts and circumstances of each particular case. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003). Because such balancing nearly always requires a jury to sift through disputed factual contentions to draw inferences therefrom and to assess credibility of witnesses, courts should grant summary judgment in excessive force cases sparingly. *Santos v. Gates*, 287 F.3d at 853; *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997).

Courts judge the reasonableness of the force exacted by a law enforcement officer from the perspective of a reasonable officer on the scene, rather than with hindsight. *Graham v. Connor*, 490 U.S. at 396-97 (1989). The calculus of reasonableness must recognize that police officers must often render split-second judgments, in tense, uncertain, and rapidly evolving circumstances, about the amount of force necessary in a particular situation. *Graham v. Connor*, 490 U.S. at 396-97.

When determining if Trooper Bart Olson exercised unreasonable force, we must measure the amount of force employed by Olson. In this regard, Thomas Sluman contends that Olson exercised deadly force. Even when law enforcement does not intend to kill or does not kill, courts characterize the force employed as deadly if the force could cause death or serious injury. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d at 1056. "Deadly force" entails a substantial risk of causing death or serious bodily harm. *Robinette v. Barnes*, 854 F.2d 909, 911-12 (6th Cir. 1988).

Bart Olson used his car to impede Thomas Sluman's progress. In *Brosseau v. Haugen*, 543 U.S. 194, 200, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004), the Supreme Court noted that a car can be a deadly weapon, although the Court deemed reasonable the officer's decision to stop the car from possibly injuring others. *Brosseau v. Haugen*, 543 U.S. at 200. We observe that Thomas Sluman rode a motorcycle, rather than drove an automobile. A law enforcement officer's use of a squad car to block a motorcycle's path constitutes deadly and unreasonable force. *Walker v. Davis*, 649 F.3d 502, 503-04 (6th

16

Cir. 2011); *Donovan v. City of Milwaukee*, 17 F.3d 944, 949-50 (7th Cir. 1994).

Washington State Patrol regulations confirm use of a patrol car to be lethal force. The regulations provide "intentional intervention . . . of a vehicle is the deliberate act of hitting another vehicle with a patrol vehicle(s) for the purpose of functionally damaging or forcing the other vehicle off the road." CP at 661. The State Patrol rules also declare that "intentional intervention is considered the use of lethal force . . . [and] officers attempting intentional intervention with a vehicle shall be held to the same standards as are applied to any other use of lethal force." CP at 661-62.

We proceed on the assumption that Trooper Bart Olson's door-checking constituted deadly force. Although the seizure did not kill Thomas Sluman, the seizure imperiled Sluman's life and caused serious injury. Bart Olson denies that he exerted deadly force, but he provides no decision to support the denial.

We must now address whether Thomas Sluman's conduct justified Trooper Bart Olson's exercise of deadly force. The balancing process applied in excessive force cases demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. *Tennessee v. Garner*, 471 U.S. at 9 (1985). As a subset of excessive force claims, the United States Supreme Court has held that police use of "deadly force" violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner*, 471 U.S. at 11. The individual interests at stake rise to their

zenith when law enforcement seizes a citizen by deadly force because of the fundamental interest in one's life. *Tennessee v. Garner*, 471 U.S. at 9. The use of deadly force by law enforcement against a suspect frustrates the interest of the individual, of society, and in the judicial determination of guilt and punishment. *Tennessee v. Garner*, 471 U.S. at 9.

The peaceful submission of suspects holds no priority over the interest in life. *Tennessee v. Garner*, 471 U.S. at 9-10. Employing deadly force to vindicate our criminal justice system defeats its purpose since, if successful, that system will not be set in motion. *Tennessee v. Garner*, 471 U.S. at 10. Thus, the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. *Tennessee v. Garner*, 471 U.S. at 11. On the other hand, if the suspect threatens the officer with a weapon or probable cause exists to believe that he committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, when feasible, some warning has been given. *Tennessee v. Garner*, 471 U.S. at 11-12. Under Thomas Sluman's version of the facts, he received no warning.

Even under the State's version of the facts, Thomas Sluman did not commit a crime involving serious physical harm to another. Law enforcement sought to stop Sluman for speeding. Washington State Patrol officers did not even seek to capture Sluman because of a crime. Sluman was not armed. No officer knew that Sluman discerned he was being pursued. According to Trooper Paul Blume, Sluman never

18

looked in his direction.  Thus, no officer knew that Sluman sought to elude the police.

Trooper Bart Olson asserts that he held a governmental interest in protecting the public from injury or death when stopping Thomas Sluman.  Olson emphasizes that the motorcycle's high speed posed a risk to persons in the immediate area.

Language in *Tennessee v. Garner*, 471 U.S. 1 (1985) disassembles Bart Olson's argument.  In *Garner*, the Supreme Court noted, based on extensive research and consideration, that laws permitting police officers to use deadly force to apprehend unarmed, nonviolent fleeing felony suspects do not protect citizens or law enforcement officers, do not deter crime or alleviate problems caused by crime, and do not improve the crime fighting ability of law enforcement agencies.  *Tennessee v. Garner*, 471 U.S. at 19.  Thus, the government's interest in ending a high-speed chase of an unarmed perpetrator does not justify deadly force.  Accordingly, the Fourth Amendment's right to be free from unreasonable seizure prohibits the use of lethal force to apprehend a fleeing felon in the absence of an immediate threat of serious physical harm or death.  *Tennessee v. Garner*, 471 U.S. at 11.

Trooper Bart Olson cites three United States Supreme Court decisions to support his argument that, as a matter of law, he did not exert excessive force: *Mullenix v. Luna*, ___ U.S. ___, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015); *Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014); and *Brosseau v. Haugen*, 543 U.S. at 200 (2004).  We review each decision and find each factually distinguishable because the

19

person seized actually endangered the lives of officers and others.

In *Mullenix v. Luna*, 136 S. Ct. 305 (2015), the Court only addressed the qualified immunity question, not whether the officer breached the Fourth Amendment. Thus, the Supreme Court only focused on whether the right at issue was clearly established.

In *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), a law enforcement officer stopped Donald Rickard for an inoperable headlamp on his car. A passenger rode in Rickard's automobile. When the officer asked Rickard to exit the vehicle, he sped away. A chase ensued that took Rickard and the pursuing officers to an interstate. The vehicles swerved through traffic at speeds over one hundred miles per hour. During the chase, Rickard and officers passed more than two dozen vehicles. Eventually Rickard exited the interstate and executed a quick turn that caused contact with a police cruiser. As a result of the contact, Rickard's car spun into a parking lot and collided with Officer Plumhoff's vehicle. Two officers exited their vehicles to approach Rickard's car and pound on the passenger's window. At this point, Rickard's car struck another police vehicle, causing his car to temporarily intertwine with the bumper of the police car. Officer Plumhoff exited his patrol car and fired three shots into the car, but an undeterred Rickard unstuck and reversed his car. Rickard maneuvered onto the street, while forcing an officer to step to the side in order to avoid being hit by Rickard's vehicle. As Rickard fled down the street, two other officers fired twelve shots. Rickard lost control of his car, which crashed into a building. A combination of bullets and the impact with the structure killed

Rickard and his passenger. The high Court held that the Fourth Amendment allowed deadly force in this instance because of the high speed, the passing of many vehicles by Rickard, Rickard forcing other motorists off the road, the collision with a patrol car, the acceleration and escape after the interlocking of Rickard's car with the patrol car, and Rickard's continued flight after the first shots. Thomas Sluman's suit possesses none of these critical circumstances.

In *Brosseau v. Haugen*, 543 U.S. 194 (2004), law enforcement garnered a felony warrant for the arrest of Kenneth Haugen on drug and other offenses. Thereafter a neighbor of Kenneth Haguen's mother notified police that Haugen and another man fought on the mother's yard. Officer Rochelle Brosseau responded to the call. When Officer Brosseau arrived, Haugen escaped. Brosseau called for assistance and officers arrived at the scene and spread through the neighborhood to locate a hiding Haugen.

Officer Rochelle Brosseau eventually found Kenneth Haugen, who ran from her toward his mother's home's driveway, jumped into the driver's seat of a Jeep, and closed and locked the door. Brosseau ran to the Jeep, pointed her weapon at Haugen inside the vehicle, and ordered Haugen to exit the Jeep. Brosseau repeated the command while hitting the window several times with her handgun. The window shattered. Brosseau unsuccessfully attempted to grab the Jeep's keys from Haugen, and she struck Haugen in the head with the barrel and butt of her gun. A persistent Haugen started the Jeep. Officer Brosseau fired a shot through the rear driver's side window, which shot struck

Haugen's back. An undeterred Haugen left the driveway, swerved across the neighbor's lawn, and drove down the street. A half block later, Haugen noticed his gunshot wound and stopped the vehicle.

*Brosseau*'s facts differ from the facts of this appeal. Kenneth Haugen posed an immediate threat to law enforcement officers. He fought with another man, which evidenced his violent nature before officers even arrived at the scene. The violence and escape occurred in a neighborhood with other officers in the streets of the neighborhood looking for Haugen after Brosseau already located him. People occupied two cars on both sides of the Jeep when Haugen maneuvered the car out of the driveway. Haugen persisted in escaping after multiple commands to exit the car, after being hit in the head with a gun, and after being shot in the back. These actions led the United States Supreme Court to find Haugen a threat thereby making Brosseau's actions reasonable. The Court explained that Haugen proved he would take extreme measures to avoid capture and he posed a major threat to, among others, the officers at the end of the street. Thomas Sluman's appeal bears none of these critical facts.

Trooper Bart Olson also mentions *Scott v. Harris*, 550 U.S. 372, 374-75, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The speeding motorist also initiated a chase on a two-lane highway. But, unlike in Thomas Sluman's case, the motorist exited the road and entered a parking lot of a shopping center because of a crowded roadway. Police vehicles nearly trapped the motorist's car inside the lot. In order to evade the trap, the

motorist executed a sharp turn, collided with an officer's police car, exited the parking lot, and again sped away.

The facts viewed in the light most favorable to Thomas Sluman distinguish this appeal from *Brosseau*, *Scott*, *Mullenix*, and *Rickard*. Thomas Sluman drove on a two-lane highway, not in a residential neighborhood. An unpopulated South Thorp Highway lacked turns into business parking lots. Sluman did not endanger the public by driving erratically through a parking lot. Officers formed the intent to stop Sluman after witnessing him speeding on the highway. Sluman bore no arms, did not appear armed, and communicated no threats to police officers or anyone else. Sluman did not weave through traffic and did not aggressively pass cars in an attempt to elude the police. Sluman also did not act as a threat by hitting police cars in an attempt to escape. Sluman only struck Trooper Olson's car when Olson door-checked Sluman and sent him careening over the edge of the bridge to the ground below.

Thomas Sluman obeyed all traffic laws except the speed limit. The one hundred miles per hour speed reached in *Plumhoff* was not disputed. Sluman disputes Bart Olson's claim that Sluman exceeded one hundred miles per hour, and Sluman provides a sound reason to discount the plane operator's estimate of the speed.

In his argument, Trooper Bart Olson erroneously claims that Thomas Sluman does not dispute Olson's version of the facts. Bart Olson also repeatedly pictures the facts in a light favorable to him, while ignoring his own testimony and the testimony of other

23

Washington State Patrol troopers.

Trooper Olson repetitively writes of the safety of pedestrians and other motorists imperiled by Thomas Sluman's flight on a motorcycle. Nevertheless, facts support the conclusion that Sluman endangered no pedestrians or other motorists as he drove on South Thorp Highway. Olson asserts that he acted, as part of a team, to protect citizens at a well-traveled intersection from a motorcyclist traveling at speeds over 120 miles per hour. Olson did not act as a team. Instead, the undisputed facts show he performed as a rogue officer who violated numerous Washington State Patrol regulations. Olson forwards no evidence of the number of travelers, if any, near the point of impact on South Thorp Highway. Sluman traveled between 30 and 40 m.p.h. when Trooper Bart Olson door-checked him.

Trooper Bart Olson writes that South Thorp Highway runs through a high density residential farm area. We doubt that any farm area, regardless of the presence of some residences, to be of high density. Regardless, no facts show the area to be high density. The video filed as evidence contradicts this assertion. A photograph cited for this proposition shows police cars parked on a bridge, not a high-density farm area.

Bart Olson contends that Thomas Sluman's speed on South Thorp Highway endangered others. Nevertheless, in his deposition, Trooper Olson testified that "nobody was in the area." CP at 535. The State also mentions the presence of innocent parties at the nearby campground. No evidence shows any persons then present in the campground

to be endangered. No decision has held that the theoretical possibility that people may be in the area qualifies as the type of immediate threat that justifies the use of lethal force.

Based on the United States Supreme Court decision in *Scott v. Harris*, 550 U.S. 372 (2007), Trooper Bart Olson argues that Thomas Sluman cannot testify or present testimony of witnesses contrary to the videotape that recorded Sluman's collision of Olson's patrol car door. We accept this argument but observe that the video supports Sluman's version of the facts, not the State's description of the facts.

Although not United States Supreme Court decisions, we consider two federal appeals court decisions, *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003) and *Walker v. Davis*, 649 F.3d 502 (6th Cir. 2011), to parallel the facts in Thomas Sluman's appeal. Both decisions support our holding that Thomas Sluman presents facts to establish that Trooper Bart Olson exercised unreasonable force. We outline the facts and rulings of the two cases in our Appendix A.

Trooper Bart Olson violated many Washington State Patrol rules when pursuing Thomas Sluman and impeding Sluman's progress. Some federal circuits have held that an officer's violation of department standards lacks relevance to whether the officer violated the Fourth Amendment, in part because such a rule would promote law enforcement departments to lower their standards. *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *see Ford v. Childers*, 855 F.2d 1271 (7th Cir. 1988). Other circuits, including our home circuit, have ruled that training bulletins, department regulations, and

guidelines hold relevance to the reasonableness of an officer's conduct in applying force. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d at 1059 (9th Cir. 2003). Under this second view, a court may question an officer's action as reasonably prudent if banned by his or her department or of whose dangers he or she had been warned. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998); *Scott v. Henrich*, 39 F.3d 912, 915-16 (9th Cir. 1994). We see no reason to resolve this discrepancy. We note, however, that the United States Supreme Court in *Tennessee v. Garner*, 471 U.S. 1 (1985), considered the regulations of major cities and the Federal Bureau of Investigation when ruling deadly force unconstitutional except when the suspect threatens the life of another and only after a warning.

*Issue 3: Whether qualified immunity shields Trooper Bart Olson from liability to Thomas Sluman as a matter of law?*

*Answer 3: No.*

After concluding that facts support a conclusion that Trooper Bart Olson violated Thomas Sluman's Fourth Amendment right to be free from unreasonable seizures, we now address whether disputed facts prevent application of qualified immunity in favor of Bart Olson. We again rely on federal cases.

Under United States Supreme Court precedent, a law enforcement officer receives qualified immunity under § 1983 unless (1) he or she violated a federal statutory or constitutional right, and (2) the unlawfulness of the conduct was "clearly established at

26

the time." *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018). A clearly established right constitutes a sufficiently clear right that every reasonable official would recognize. *Mullenix v. Luna*, 136 S. Ct. at 308 (2015). This test may be redundant since a reasonable person, or at least a reasonable government officer, should know of all clearly established constitutional rights.

42 U.S.C. § 1983 immunity balances two important interests, the need to hold public officials accountable when exercising power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

The United States Supreme Court has employed various phrases in an endeavor to elucidate and define the idiom "clearly established law." Existing law must have placed the constitutionality of the officer's conduct "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. at 589. To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *District of Columbia v. Wesby*, 138 S. Ct. at 589. The violated rule must be "settled law." *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991). The law must result from "controlling authority" or a robust consensus of "cases of persuasive authority." *Wilson*

27

*v. Layne*, 526 U.S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999). The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *District of Columbia v. Wesby*, 138 S. Ct. at 590.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. *District of Columbia v. Wesby*, 138 S. Ct. at 590. The rule's contours must be so well defined that a reasonable officer will clearly know that his conduct was unlawful in the situation he confronted. *Carroll v. Carman*, ___ U.S. ___, 135 S. Ct. 348, 350, 190 L. Ed. 2d 311 (2014).

We encounter some difficulty in discerning clearly established law, since the law does not and cannot mathematically quantify the specificity or generality of its tenets, the clearness or opaqueness of its rules, or the concreteness or abstraction of its principles. Nevertheless, we seek to assess qualified immunity by musing and meditating on the facts in reported Fourth Amendment decisions and the closeness of those facts to the conduct of Thomas Sluman and Trooper Bart Olson. We also examine and evaluate the specificity of the rules announced in the decisions.

United States Supreme Court jurisprudence has announced some conflicting principles with regard to assessing clearly established law. On the one hand, some United States Supreme Court decisions caution lower courts when measuring the

particularity of a constitutional rule. The Supreme Court has repeatedly admonished courts from defining clearly established law at a high level of generality. *Mullenix v. Luna*, 136 S. Ct. at 308 (2015). Withholding immunity requires a high "degree of specificity." *Mullenix v. Luna*, 136 S. Ct. at 309. A rule is too general if the unlawfulness of the officer's conduct does not follow immediately from the conclusion that the rule was firmly established. *Anderson v. Creighton*, 483 U.S. at 641 (1987). For example, the Court has reversed cases when lower courts denied an official qualified immunity based on *Garner*'s general holding that an officer employs unreasonable force when he or she uses deadly force on an unarmed fleeing felon. *Mullenix v. Luna*, 136 S. Ct. at 308-09. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment helps little in determining whether the law clearly establishes the violative nature of particular conduct. *Ashcroft v. al-Kidd*, 563 U.S. at 742 (2011); *Saucier v. Katz*, 533 U.S. at 201-02 (2001).

On the other hand, the United States Supreme Court has also cautioned lower courts not to demand identical facts to prior decisions before withholding qualified immunity. Qualified immunity does not automatically protect official action only if a court has held unlawful the very action in question. *Anderson v. Creighton*, 483 U.S. at 640 (1987). The Court does not require a case directly on point to deny immunity. *Mullenix v. Luna*, 136 S. Ct. at 308. There can be the rare "obvious case," when the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent

does not address similar circumstances. *Brosseau v. Haugen*, 543 U.S. at 199 (2004).

Officials can still be on notice that their conduct violates established law even in novel

factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d

666 (2002). The "salient question" is whether the state of the law gave the defendant

"fair warning" that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S.

at 741.

The Supreme Court has outlined steps for a court to undertake when determining

whether a law enforcement officer charged with excessive force by employing deadly

force deserves qualified immunity. The court starts by defining the circumstances that

confronted the law enforcement officer. *District of Columbia v. Wesby*, 138 S. Ct. at 589.

The court then evaluates the constitutionality of the police officer's use of deadly force in

light of *Garner. Tennessee v. Garner*, 471 U.S. at 11-12; *Vaughan v. Cox*, 343 F.3d at

1332 (11th Cir. 2003). Nevertheless, the court may not base its decision on any "general"

rule found in *Garner* as to excessive force. *Brosseau v. Haugen*, 543 U.S. at 199.

Instead, an officer will be entitled to qualified immunity if he had "arguable probable

cause" to employ deadly force. *Vaughan v. Cox*, 343 F.3d at 1332 (11th Cir. 2003). In

essence, the court decides whether "the officer reasonably could have believed that

probable cause existed" to use deadly force. *Montoute v. Carr*, 114 F.3d 181, 184 (11th

Cir. 1997). In evaluating an officer's assertion of a qualified immunity defense, we apply

an objective standard, asking whether the officer's actions are objectively reasonable in

30

light of the facts confronting the officer, regardless of the officer's underlying intent or motivation. *Montoute v. Carr*, 114 F.3d at 183. Judges must be cautious about second guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation. *Ryburn v. Huff*, 565 U.S. 469, 477, 132 S. Ct. 987, 181 L. Ed. 2d 966 (2012).

Although law enforcement officers are not trained lawyers, they are taught search and seizure law in training. One decision suggests that officers should be able to reason as to what facts are important in a United States Supreme Court decision. *Hope v. Pelzer*, 536 U.S. at 742 (2002).

The United States Supreme Court has yet to decide what precedents, other than its own decisions, qualify as controlling authority for purposes of qualified immunity. *District of Columbia v. Wesby*, 138 S. Ct. at 591 n.8. Therefore, we begin with some Supreme Court decisions.

In *Mullenix v. Luna*, 136 S. Ct. 305 (2015), the Court did not address whether the officer breached the Fourth Amendment, but instead addressed whether the law had clearly established the right at issue. Trooper Bart Olson highlights *Mullenix*.

In *Mullenix*, one officer approached Israel Leija's vehicle at a drive-in restaurant to inform Leija that he was under arrest pursuant to active arrest warrants. After the officer spoke, Leija sped toward a Texas interstate highway as other officers joined the pursuit. Twice during the chase, Leija called police dispatch and claimed to hold a gun

while threatening to shoot police officers if they did not abandon their pursuit. The dispatcher relayed Leija's threats, together with the report that Leija might be intoxicated, to all concerned officers.

While the chase of Israel Leija continued, other officers laid spike strips at three locations, the first of which was located beneath an overpass. Trooper Chadrin Mullenix was one of the responding officers. He journeyed to the overpass initially intending to help lay the spike strip, but upon arrival at the overpass, he switched to a different tactic: shooting at Leija's car in order to disable it. Trooper Mullenix radioed the idea to another officer who agreed with the plan so Mullenix asked the dispatcher to inform his supervisor in order to gain his approval. Before receiving a response, Mullenix stood on top of the overpass and twenty feet above the interstate with his rifle aimed below. Mullenix knew that another officer manned the spike strip on the roadway beneath the overpass. Three minutes after taking his sniper's position, Trooper Mullenix spotted Leija's vehicle approaching the overpass and fired six shots, one or more which killed Leija.

The United States Supreme Court, in *Mullenix v. Luna*, held that the officer did not violate a clearly established right but only in the context of the unique facts. The Court stated "none of our precedents 'squarely governs' the facts here." *Mullenix v. Luna*, 136 S. Ct. at 310. Those facts included a suspect threatening to shoot at officers. The Court defended Trooper Mullenix's actions by highlighting that fellow officers stood

below the overpass, that Mullenix knew of the officers' presence, that Leija had twice threatened to shoot officers, and that Leija raced toward an officer's location.

The facts in our appeal lack any of these or similar details. Thomas Sluman never threatened to shoot anyone, let alone officers, and never appeared armed. The Supreme Court specifically distinguished *Mullenix* from four other cases where it found the facts too distinct to speak to the circumstances involved in *Mullenix*.

We already detailed facts in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), *Scott v. Harris*, 550 U.S. 372 (2007), and *Brosseau v. Haugen*, 543 U.S. 194 (2004). In *Brosseau*, the Court held that an officer did not violate clearly established law when she shot a fleeing suspect out of fear that he endangered other officers on foot who she believed were in the immediate area, the occupied vehicles in his path, and any other citizens who might be in the area. In *Scott v. Harris*, 550 U.S. 372, the Court held that an officer did not violate the Fourth Amendment by ramming the car of a fugitive whose reckless driving posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase.

In *Plumhoff v. Rickard*, 134 S. Ct. 2012, the Court reaffirmed *Scott* by holding that an officer acted reasonably when he fatally shot a fugitive who was intent on resuming a chase that posed a deadly threat for others on the road. During that chase, Rickard passed more than two dozen other vehicles, several of which were forced to alter course.

33

Rickard's outrageously reckless driving posed a grave public safety risk. When Rickard's car eventually collided with a police car and came temporarily to a standstill that did not end the chase. Less than three seconds later, Rickard resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse in an attempt to escape.

The law directs us to outline the important facts as seen by the defending law enforcement officer when the officer employs force or at least those facts that a reasonable officer confronted with the same circumstances would know. Trooper Bart Olson underwent training not to block the path of a vehicle on the road. Trooper Olson had been directed to end his pursuit of Thomas Sluman. Olson knew that an aircraft followed Sluman and could continue to follow Sluman. Olson, as he testified in his deposition, knew no one else was in the area where he parked his patrol car and Thomas Sluman rode his motorcycle. Therefore, Olson knew that Sluman did not endanger the public or officers. Olson had no knowledge that Sluman knew he was being pursued. Olson knew that Sluman had made no threats to law enforcement officers. Olson had no knowledge of Sluman being armed. By training, Bart Olson knew erecting a roadblock or interfering with a motorcyclist's movement constituted deadly force. Still, Olson employed deadly force to stop the movement of Sluman.

34

Assuming we must ground our determination of clearly established law only on United States Supreme Court precedent, the Supreme Court decided *Brower v. County of Inyo*, 489 U.S. 593 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985) decades before Trooper Bart Olson's conduct in 2010.  Both cases warned Trooper Bart Olson that a law enforcement officer violates the Fourth Amendment when terminating the citizen's movement with force when the citizen does not violate the law.  The high Court rulings cautioned Olson that he may not employ deadly force unless he had probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.  *Brower v. County of Inyo* imposed liability on an officer for erecting a roadblock when the suspect did not pose such a threat.  Although Olson may be able to identify some distinguishing facts from *Brower*, he cannot identify any facts that call for a different outcome in his suit.

We find no case involving a door-check.  Nevertheless, any reasonable officer by 2010 should have known not to door-check a motorcyclist traveling on an uncrowded road when the motorcyclist had not earlier interfered in the travel of other motorists.  No reported decision excuses a law enforcement officer's conduct under these circumstances.

Four federal circuit court decisions withhold qualified immunity to a law enforcement officer in similar cases as presented in this appeal.  *Walker v. Davis*, 649 F.3d 502 (6th Cir. 2011); *Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007); *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003); *Hawkins v. City of Farmington*, 189 F.3d 695 (8th

35

Cir. 1999). To shorten a lengthy decision, we outline all decisions in Appendix B.

Trooper Bart Olson phrases the issue in Thomas Sluman's appeal as: assuming all facts in the light most favorable to Sluman, was the law clearly established in July 2010 that the Fourth Amendment prohibited a law enforcement officer, making a split-second decision concerning the safety of pedestrians and other motorists imperiled by a suspect fleeing on a motorcycle, from opening the door of his patrol car into the motorcycle's path, even when the suspect had done no more than elude police? In so framing the issue, Trooper Olson assumes facts in the light most favorable to him, not Thomas Sluman. Thomas Sluman did not endanger pedestrians or other motorists when Sluman drove on South Thorp Highway. Some facts show that Sluman did not elude law enforcement.

Trooper Bart Olson also frames the issue as: does the law afford Olson qualified immunity when he performed a traffic stop to prevent Sluman from entering a high traffic density highway interchange when Sluman sped over one hundred twenty miles per hour to elude law enforcement? Again, Olson views the facts in a glow beneficial to him. No facts support a finding that Sluman entered a high traffic density interchange. Olson averred that no one else was present. Inferences from facts suggest Sluman did not travel even over one hundred miles per hour. Again, some facts question whether Sluman sought to elude police. Assuming Sluman knew of the pursuit, his only felony was eluding an officer.

Trooper Bart Olson also emphasizes that he made a split-second judgment when parking his car on the Yakima River Bridge and when opening his car door. We recognize that the United States Supreme Court wishes police officers leniency when rendering split second decisions. Nevertheless, the Court has never held that all quick decisions carry qualified immunity. We also question whether Bart Olson engaged in a split-second decision. Inference from other facts suggest that, from the time of his notice that Trooper David Hinchliff pursued Thomas Sluman, Olson intended to take extraordinary steps to end the travel of Sluman. Olson reflected before parking his car in the middle of the road in an attempt to horse collar Sluman.

Trooper Bart Olson presents no testimony relating his knowledge of the law of search and seizure. Olson presents no testimony that he relied on any particular court decisions or deemed himself compliant with constitutional principles when door-checking Thomas Sluman. Under the facts as presented by Thomas Sluman, Trooper Bart Olson's conduct breached clearly established constitutional rights. Federal case law interpreting similar claims would have placed a reasonable officer on notice that using unauthorized deadly force against a fleeing suspect that is only wanted for traffic violations breaches the Fourth Amendment. The only risk posed in this case was the risk of an accident which Trooper Olson, not Thomas Sluman, turned into a reality.

Washington State Trooper Bart Olson emphasizes recent United States Supreme Court decisions that reverse lower court decisions denying a law enforcement officer

37

qualified immunity.  *District of Columbia v. Wesby*,  138 S. Ct. 577 (2018); *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017); *Mullenix v. Luna*, 136 S. Ct. 305 (2015); *Taylor v. Barkes*, ___ U.S. ___, 135 S. Ct. 2042, 192 L. Ed. 2d 78 (2015); *City and County of San Francisco v. Sheehan*, ___ U.S. ___, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015); *Carroll v. Carman*, 135 S. Ct. 348 (2014); *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Wood v. Moss*, ___ U.S. ___, 134 S. Ct. 2056, 188 L. Ed. 2d 1039 (2014); *Stanton v. Sims*, 571 U.S. 3, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013); *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012); *Ryburn v. Huff*, 565 U.S. 469 (2012); *Messerschmidt v. Millender*, 565 U.S. 535, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011).  *Carroll v. Carman* concerns the application of the knock and talk practice.  *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) concerns an amusing false arrest claim, not an excessive force allegation, wherein partygoers at a bachelor party could not identify the bachelor.  *Messerschmidt v. Millender* addressed an arrest pursuant to a search warrant.  *Reichle v. Howards* involves a First Amendment retaliatory arrest.  *Stanton v. Sims* and *Ryburn v. Huff* concern warrantless entries into homes.  *Taylor v. Barkes* involves the Eighth Amendment.  *Wood v. Moss* is a First Amendment case.  In *White v. Pauly*, the officer used deadly force when the injured party said he had a gun.  In *City and County of San Francisco v. Sheehan*, officers also used deadly force against a decedent who possessed a knife and threatened to use the weapon.

We accept the recent decisions as precautionary instructions to carefully review the facts of each case and ensure that the facts support a conclusion that the officer violated clearly established law. Nevertheless, the decisions do not bestow absolute immunity on the officers. In short, Thomas Sluman presents many cases that establish that Trooper Bart Olson violated his clearly established Fourth Amendment rights. Bart Olson forwards no decision that helps him under these circumstances. All of Olson's promoted decisions involve the speeding person to have endangered the lives of others.

Felony Bar Statute

We now begin our review of Thomas Sluman's state law claims. Since Sluman seeks to reverse dismissal of state law claims asserted against both Trooper Bart Olson and the State of Washington and since the two defendants' interests coincide, we hereafter refer to both defendants in the aggregate as the State.

Thomas Sluman pled state causes of action of false arrest, false imprisonment, negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent training and supervision. Sluman agreed to dismissal of false arrest and false imprisonment. The trial court dismissed on summary judgment the remaining claims over the objection of Sluman. We will later briefly analyze each of these remaining claims but must first address a defense common to all state law claims, the felony bar rule.

In his brief, Thomas Sluman argued against application of the public duty doctrine. The State does not contend, in its brief, that the public duty doctrine bars Sluman's state law causes of action. Therefore, we proceed on the assumption the State has abandoned any defense, for purposes of a summary judgment motion, based on the doctrine. The State may still assert the doctrine before the trial court since Sluman has not asked for the dismissal of the defense as a matter of law.

On appeal, the State asks us to affirm summary judgment dismissal of all state claims based on Washington's felony bar statute. RCW 4.24.420 provides:

> It is a complete defense to any action for damages for personal injury or wrongful death that the person injured or killed was engaged in the commission of a felony at the time of the occurrence causing the injury or death and the *felony was a proximate cause of the injury* or death. However, nothing in this section shall affect a right of action under 42 U.S.C. Sec. 1983.

(Emphasis added.)

Thomas Sluman resists application of the felony bar statute on two grounds. First, he did not commit a felony. Second, any crime he committed was not a proximate cause of his injuries. We could base our reversal of the application of the statute as a matter of law in favor of the State solely on proximate cause, but because the question of Sluman's purported commission of a felony may arise again on remand, we also address this second ground.

40

*Issue 4: Whether collateral estoppel bars Thomas Sluman from denying he committed felony eluding a police officer?*

*Answer 4: No.*

RCW 46.61.024 declares:

> (1) Any driver of a motor vehicle who willfully fails or refuses to immediately bring his or her vehicle to a stop and who drives his or her vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given a visual or audible signal to bring the vehicle to a stop, shall be guilty of a class C felony. The signal given by the police officer may be by hand, voice, emergency light, or siren. The officer giving such a signal shall be in uniform and the vehicle shall be equipped with lights and sirens.

The State relies on RCW 46.61.024 when asserting that Thomas Sluman committed a felony. In turn, the State contends that collateral estoppel bars Thomas Sluman from denying application of the felony bar statute because Sluman pled guilty to felony eluding. Based on *Clark v. Baines*, 150 Wn.2d 905, 84 P.3d 245 (2004), we disagree.

The doctrine of collateral estoppel prevents a party from relitigating issues raised and litigated by the party in an earlier proceeding. *Reninger v. Department of Corrections*, 134 Wn.2d 437, 449, 951 P.2d 782 (1998). Washington employs a four-part test to determine whether previous litigation should be afforded collateral estoppel effect in a subsequent litigation. The party asserting collateral estoppel must prove: (1) the issue decided in the prior adjudication is identical to the one presented in the current action, (2) the prior adjudication resulted in a final judgment on the merits, (3) the party

41

against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication, and (4) precluding relitigation of the issue will not work an injustice on the party against whom collateral estoppel is to be applied. *State v. Harrison*, 148 Wn.2d 550, 561, 61 P.3d 1104 (2003). We limit our discussion to element four.

The determination of whether application of collateral estoppel will work an injustice on the party against whom the doctrine is asserted depends primarily on whether the parties to the earlier proceeding received a full and fair hearing on the issue in question. *Thompson v. Department of Licensing*, 138 Wn.2d 783, 795-96, 982 P.2d 601 (1999). Accordingly, a criminal conviction after a trial may, under certain circumstances, be given preclusive effect in a subsequent civil action. *Kyreacos v. Smith*, 89 Wn.2d 425, 429-30, 572 P.2d 723 (1977). When a criminal conviction results from an *Alford* plea, however, the parties never engaged in a full hearing. *Falkner v. Foshaug*, 108 Wn. App. 113, 122-23, 29 P.3d 771 (2001); *Safeco Insurance Company of America v. McGrath*, 42 Wn. App. 58, 62-64, 708 P.2d 657 (1985). A criminal defendant convicted on the basis of an *Alford* plea, unlike a defendant convicted after a trial, has not enjoyed a fair opportunity to litigate the issues in the criminal case. *Safeco Insurance Company of America v. McGrath*, 42 Wn. App. at 62-63.

The Evergreen State Supreme Court has held that an *Alford* plea to a criminal charge does not act as collateral estoppel so as to preclude the offender from litigating the commission of the underlying act in a civil suit. *Clark v. Baines*, 150 Wn.2d at 907

42

(2004). *Clark* controls and compels a ruling that collateral estoppel does not prevent Thomas Sluman from denying he committed the felony of eluding an officer.

Our dissenting in part brother refuses to follow *Clark v. Baines*. The dissenting opinion correctly notes that the plea of guilty may be used as evidence at trial. Based on this principle, the dissent decides to accept the plea as evidence and refuses to allow Thomas Sluman to contradict the plea, in essence rendering the plea dispositive. Indirectly, the dissent applies collateral estoppel to Sluman's claim because of a dislike of *Clark*.

The state Supreme Court issued *Clark v. Baines*. This appellate court remains bound by a decision of the Washington Supreme Court. *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984). We must follow Supreme Court precedent, regardless of any personal disagreement with its premise or correctness. *State v. Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017).

*Issue 5: Whether Thomas Sluman may, in response to a summary judgment motion, deny that he attempted to elude police because he told Trooper Bart Olson of his outstanding warrants for arrest?*

*Answer 5: Yes.*

As noted by the concurring opinion, the author of this lead opinion disagrees with his two colleagues as to whether an issue of fact lies as to whether Thomas Sluman

eluded state troopers such that he violated the felony statute. Therefore, I write in the singular with respect to issues five and six, since I am in the minority.

In addition to pleading guilty to felony eluding a law enforcement officer, Thomas Sluman, at the situs of the door-check, responded to a question of Trooper Bart Olson by stating he faced outstanding arrest warrants. Trooper Olson had asked Sluman why he fled from the police. Although Sluman did not expressly state he fled, I assume that, in the context of the question, he conceded the eluding. Sluman admits he uttered the response, but he denies the accuracy of the statement. This factual background and denial poses a fascinating question: may a party, in response to a summary judgment motion, deny a fact to which he previously admitted? In answering this question, I emphasize two factors. First, Sluman did not utter his concession under oath in the context of litigation. Second, Sluman suffered from serious pain when speaking.

Washington follows the sham affidavit rule, sometimes known in Washington as the *Marshall* rule. *Taylor v. Bell*, 185 Wn. App. 270, 294, 340 P.3d 951 (2014). Under the rule, when a party earlier rendered clear answers to unambiguous deposition questions that negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony. *Taylor v. Bell*, 185 Wn. App. at 294 (2014); *Marshall v. AC&S, Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989). This rule is a narrow one. *Taylor v. Bell*, 185 Wn. App. at 294. The self-serving affidavit must

"directly contradict" the affiant's "unambiguous sworn testimony" previously given.

*Kaplan v. Northwest Mutual Life Insurance Co.*, 100 Wn. App. 571, 576, 990 P.2d 991

(2000).  Moreover, if the subsequent affidavit offers an explanation for previously given

testimony, the trier of fact should determine the explanation's plausibility.  *Safeco*

*Insurance Co. of America v. McGrath*, 63 Wn. App. 170, 175, 817 P.2d 861 (1991).

I decline to apply the sham affidavit rule in Thomas Sluman's appeal for many

reasons.  First, Sluman did not utter his comment to Trooper Bart Olson under oath.  All

cases applying the rule entail earlier deposition testimony or statements under oath, not

statements outside the context of litigation.  When rendering his concession, Thomas

Sluman underwent excruciating pain from disabling injuries, including numerous broken

bones.  Sluman had just regained consciousness and the inferences suggest Olson

confronted Sluman immediately after the latter regained cognizance.  No decision

addresses statements uttered, while under debilitating pain, because deponents generally

avoid questioning immediately after regaining consciousness from having been door-

checked and after having broken bones without any treatment.

My dissenting brother emphasizes *Marshall v. AC&S, Inc.*, 56 Wn. App. 181

(1989), in which this court applied the sham affidavit rule to preclude the claimant from

declaring he lacked knowledge of asbestos exposure more than three years past.

Although we noted that the claimant's denial contradicted medical records, we also noted

that the denial naysaid the claimant's application for workers compensation from the

United States Department of Labor. The applicant must sign such forms, as a witness

signs a declaration, under the penalty of perjury.

Our dissenting brother also notes that evidence of speed can suffice to convict one

of the crime of eluding. Of course, considering evidence as sufficient to convict says

nothing about whether some evidence contradicts guilt. Sufficient evidence does not

equate with undisputed evidence.

*Issue 6: Whether an issue of fact exists as to whether Thomas Sluman sought to*

*elude law enforcement officers?*

*Answer 6: Yes.*

Thomas Sluman testified in his affidavit and his deposition that he knew not that

police pursued him. The State provides no percipient testimony to the contrary. Trooper

David Hinchliff agrees that he never observed that Sluman noticed him trailing Sluman.

Also although Sluman sped, no one testified to any underlying facts that would show

Sluman operated his motorcycle in a reckless manner. The State argues that Sluman

endangered the safety of others, but the State provides no testimony or photographic

evidence supporting this argument. Therefore, a question of fact exists as to whether

Sluman eluded police officers, and, if so, whether he drove in a reckless manner.

I have already quoted RCW 46.61.024, the statute creating the crime of felony

eluding a police officer. The elements of the crime are: a suspect must (1) willfully fail,

(2) to immediately bring his vehicle to a stop, (3) and drive in a manner indicating a

wanton and willful disregard for the lives or property of others, (4) while attempting to elude police after being signaled to stop by a uniformed officer. *State v. Tandecki*, 153 Wn.2d 842, 848, 109 P.3d 398 (2005).

This court reviews a summary judgment order de novo, engaging in the same inquiry as the trial court. *Highline School District No. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). Summary judgment is proper if the record shows "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). A genuine issue is one upon which reasonable people may disagree; a material fact is one controlling the litigation's outcome. *Ranger Insurance Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). This court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Barber v. Bankers Life & Casualty Co.*, 81 Wn.2d 140, 142, 500 P.2d 88 (1972). In ruling on summary judgment, we do not weigh evidence or assess witness credibility. *Barker v. Advanced Silicon Materials, LLC*, 131 Wn. App. 616, 624, 128 P.3d 633 (2006).

The dissent and concurring author weigh the evidence and assess Thomas Sluman's credibility, contrary to summary judgment principles. They present no case law that states a witness may not contradict himself for purposes of a summary judgment motion, when the claimant did not render the earlier statement under oath or when the claimant uttered the earlier statement under extreme circumstances faced by Thomas

Sluman. Even in trial, a witness may present contradictory testimony and the jury may believe that testimony favorable to him or her.

The dissent may believe that, if a hearsay exception allows a contemporary statement to be admitted, that the testimony controls the outcome of the case. The exception to the hearsay rule, however, allows only introduction of the statement and fails to accord the statement controlling power. The dissent further weighs the evidence by writing that Thomas Sluman accelerated on the bridge after feigning a stop.

Finally, the dissent and the concurring opinion assume that Thomas Sluman violated the felony statute merely by speeding and eluding a law enforcement officer. Neither recognizes that the crime requires the further element of driving in a manner indicating a wanton and willful disregard for the lives or property of others. The record lacks facts of such wanton and willful disregard for the lives of others. That is in part why all members of the panel have held a question of fact lies as to whether Trooper Bart Olson lacked reason to door-check Sluman.

*Issue 7: Whether a question of fact exists as to whether Thomas Sluman's purported eluding of a police officer caused his injuries?*

*Answer 7: Yes.*

The concurring author agrees that an issue of fact exists as to whether any felony eluding proximately caused Thomas Sluman's injuries. Therefore, this lead opinion returns to writing in the plural, and the remaining portion of the opinion, along with the

48

answers and discussion with regard to issues one to four, should be deemed the majority opinion.

We also hold that questions of fact as to proximate causation also work to preclude summary judgment in favor of the State. RCW 4.24.420 allows the defendant a complete defense if the plaintiff engaged in a felony that qualifies as a proximate cause of the injury. This statutory requirement of proximate cause corresponds with the common law rule of proximate cause being an element of negligence. *Wuthrich v. King County*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016).

Proximate cause consists of two elements: cause in fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). Cause in fact concerns the "'but for'" consequences of an act: those events the act produced in a direct, unbroken sequence, and that would not have resulted had the act not occurred. *Smith v. Department of Corrections*, 189 Wn. App. 839, 850, 359 P.3d 867 (2015), *review denied*, 185 Wn.2d 1004, 366 P.3d 1244 (2016). Legal causation rests on considerations of logic, common sense, policy, justice, and precedent as to how far the defendant's responsibility for the consequences of its actions should extend. *Hartley v. State*, 103 Wn.2d at 779.

Thomas Sluman argues a question of fact exists because Trooper Bart Olson's parking of the car and opening of the car door superseded any conduct of Sluman in causing the injuries. The State argues that Sluman's engagement in felony eluding was a cause, which in direct sequence, produced Sluman's injuries. According to the State, if

49

Sluman had obeyed law enforcement, followed the rules of the road to yield to lights and sirens, and stopped the motorcycle, he would not have been injured. Of course, we already have ruled that a question of fact exists as to whether Sluman engaged in a felony. More importantly, the State provides no response to Sluman's contention that Trooper Olson's conduct constitutes a superseding cause.

Proximate cause, in part, involves the concept of superseding causation. An act generally is a proximate cause of an injury if it produces the injury. *Riojas v. Grant County Public Utility District*, 117 Wn. App. 694, 697, 72 P.3d 1093 (2003). Nevertheless, if a new, independent intervening act breaks the chain of causation, it supersedes the defendant's original act and is no longer the proximate cause of the injury. *Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 813, 733 P.2d 969 (1987). Whether an act may be considered a superseding cause sufficient to relieve a defendant of liability depends on whether the intervening act can reasonably be foreseen by the defendant; only intervening acts that are not reasonably foreseeable are deemed superseding causes. *Campbell v. ITE Imperial Corp.*, 107 Wn.2d at 813. Unforeseeable intervening acts break the chain of causation. *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013).

When we view the facts in a light favorable to Thomas Sluman, Sluman rode his motorcycle without any knowledge that police pursued him or desired him to stop. Based on these facts, Sluman need not have reasonably foreseen that someone would park his

car in his lane of traffic, let alone open his car door at the last moment in order to strike Sluman. Whether an intervening act constitutes a superseding cause is generally a question of fact for the jury. *Hertog ex rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275, 282-83, 979 P.2d 400 (1999); *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wn.2d 59, 83, 170 P.3d 10 (2007).

## State Law Claims

Thomas Sluman assigns error to the trial court's dismissal of all of his state law claims, which include negligence, gross negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent hiring and supervision. Sluman asserts the last claim against only the State of Washington and contends the State negligently hired and supervised Trooper Bart Olson.

We discern no purpose behind Thomas Sluman's pleading gross negligence in addition to negligence, since gross negligence does not improve Sluman's chance of prevailing. Gross negligence provides no exception to the felony bar statute. We also discern no purpose of Sluman pleading negligent infliction of emotional distress and intentional infliction of emotional distress since the two causes of action allow a plaintiff to recover emotional distress damages when the plaintiff suffered no physical injuries. Thomas Sluman indisputably suffered serious bodily injury. Finally, the State conceded in its answer that Trooper Bart Olson acted within the scope of his employment when pursuing and door-checking Sluman. When the employer does not disclaim liability for

the employee, claims of negligent hiring, training, and supervising collapse into a direct tort claim against the employer. *Brownfield v. City of Yakima*, 178 Wn. App. 850, 878, 316 P.3d 520 (2013).

The State of Washington provides no argument in support of summary judgment dismissal of the state law claims other than the application of the felony bar rule and the unwise argument discussed in the following paragraph that Trooper Paul Blume, not Bart Olson, door-checked Thomas Sluman. Because the State does not present arguments to dismiss any of the state law claims on their merits, we reverse the summary judgment order as to all claims.

The State raises the injudicious argument that Thomas Sluman sued the wrong trooper. In his deposition, Thomas Sluman declared that a sports utility vehicle struck him. Trooper Paul Blume drove the SUV, and Olson drove a Dodge Charger. Nevertheless, the overwhelming facts establish that Olson's patrol car, not Blume's vehicle, struck Sluman. All Washington State Patrol witnesses, including Olson, testified that Olson, not Blume, door-checked Sluman. Sluman understandably must be confused. A confused witness' testimony presents precarious grounds for granting summary judgment.

CONCLUSION

We reverse summary judgment dismissal of Thomas Sluman's federal civil rights

claims and state law claims.

 

 

_____

Fearing, J.

APPENDIX A

In *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), a Georgia County's Sheriff's Department received a report that a red pickup truck with a silver tool box in its bed had been stolen from a service station along Interstate 85 south of Atlanta. The report included the information that the suspect, a white male wearing a white t-shirt, was heading north on Interstate 85. In response to the report, Deputy Fred Lawrence Cox and Deputy Jeff Looney headed to the northbound lanes of Interstate 85 in separate vehicles. Deputy Looney pulled onto the grass median to observe passing traffic. Deputy Cox continued farther north and stopped at the site of a recent accident. Deputy Looney soon spotted a truck traveling northward that matched the description of the stolen vehicle but, contrary to the report, it towed a trailer loaded with two personal watercraft. Looney reported his sighting on his radio and began to follow the truck.

After hearing Looney's report, Deputy Lawrence Cox radioed Deputy Jeff Looney to inform him of an accident north of Looney's position and that he should not attempt to stop the vehicle until it had passed the accident. As the red pickup and Deputy Looney passed him, Deputy Cox joined the pursuit. While tracking the truck, the deputies made efforts to determine whether the vehicle was indeed the stolen truck. To this end, Deputy Cox passed the truck, which proceeded at or near the speed limit of seventy miles per hour. He observed two men in the cab. The man in the passenger's seat, Jerry Vaughan,

matched the description of the suspect. Cox relayed his suspicion to Looney, and the two

deputies performed a "rolling roadblock" to stop the vehicle. The rolling roadblock

entails officers blocking a suspect vehicle with their police cruisers and reducing their

speed, in the hope that the suspect car will slow as well. Deputy Looney positioned his

cruiser directly behind the pickup. The officers thereby signaled their desire to stop the

pickup. As soon as he had positioned his vehicle in front of the truck, Cox applied his

brakes. According to Vaughan and the pickup's driver, Freddy Rayson, the impact was

both accidental and insufficient to cause Cox to lose control of his patrol car. After the

collision, Rayson accelerated while staying in the same lane of traffic.

Deputy Lawrence Cox decided to reposition his vehicle behind the truck. He

unholstered his sidearm and rolled down the passenger side window. Cox then shifted

his cruiser one lane to the left and slowed to allow the truck to pass him. As soon as his

cruiser was even with the pickup, Deputy Cox turned on his rooftop lights. Rayson

responded by accelerating to eighty to eighty-five miles per hour in a seventy-mile-per-

hour zone. Cox fired three rounds into the truck without warning. Deputy Cox sought to

disable either the truck or Rayson so that he could force the truck off the road.

Nevertheless, his volley disabled neither the truck nor Rayson. The third bullet instead

punctured Vaughan's spine, instantly paralyzing him below the chest. Rayson's only

reaction to the shooting was to drive faster and more recklessly. Rayson began a

55

desperate break for freedom that involved weaving in and out of lanes, driving at high speeds through exit ramps, and dragging at least one of the watercraft, which had fallen off the trailer, along the ground. As the chase continued into more heavily congested sections of the highway, Cox fired his weapon again and repositioned his cruiser in front of the truck. The truck struck Cox's cruiser, causing the cruiser to spin out of control and ram into a steel guard rail. Cox was injured and his cruiser was badly damaged, but the truck continued while dragging the trailer and watercraft behind. Finally, when Rayson tried to force the truck between two vehicles, he lost control of the pickup, the trailer jack-knifed, and the truck hit the cement median. Both Vaughan and Rayson were taken to the hospital.

Jeffrey Vaughan sued Lawrence Cox. The trial court granted Deputy Cox summary judgment on the basis that, since Cox aimed his shots at the driver, he did not seize Vaughan. The trial court also concluded that Cox was entitled to qualified immunity. The Eleventh Circuit Court of Appeals reversed. Since Cox sought to stop Rayson and Vaughan, the deputy seized both when firing his weapon. The appellate court also held that a reasonable jury, based on Vaughan's version of the facts, could conclude that Deputy Cox exerted unreasonable force. Neither Vaughan nor his driver had threatened the lives of others or committed a violent felony before the shots. Evidence showed that Rayson's truck was easily identifiable and could have been

tracked, and that the officers could have sought assistance from other jurisdictions to follow the suspects. Also, a jury could have reasonably concluded that Cox had the feasibility to warn Vaughan and Rayson of the potential use of deadly force.

In *Walker v. Davis*, 649 F.3d 502 (6th Cir. 2011), shortly after midnight in rural Kentucky, a police officer clocked Thomas Germany riding his motorcycle at seventy miles per hour in a fifty-five mile per hour zone. That officer attempted to pull over Germany for speeding, but Germany refused to stop. Deputy Danny Davis heard about the pursuit over the radio. As Germany approached Davis' location, Davis blocked the road with his cruiser. Germany maneuvered around him, and Davis gave chase. The pursuit lasted five minutes and transpired on empty stretches of highway. Germany never went above sixty miles per hour during the chase. He ran one red light.

Thomas Germany eventually turned off the rural road and journeyed across a muddy field. Officer Danny Davis followed in his cruiser. According to a reconstruction expert, who analyzed the location of paint transfers between the two vehicles, Davis then intentionally rammed Germany's motorcycle. The ramming threw Germany from the motorcycle and dragged him underneath the cruiser, crushing him to death.

The Sixth Circuit, in *Walker v. Davis*, focused on whether Officer Danny Davis should receive qualified immunity. The court noted, however, that settled law for a generation held that, under the Fourth Amendment, when a suspect poses no immediate

threat to the officer and no threat to others, the harm resulting from failing to apprehend

him does not justify the use of deadly force. The court added that ramming a motorcycle

with a police cruiser involves the application of deadly force.

Appendix B

In *Hawkins v. City of Farmington*, 189 F.3d 695 (8th Cir. 1999), the court disagreed with the officer's contention that, in September 1994, his actions in creation of a partial roadblock violated any constitutional right. *Brower v. County of Inyo*, decided in 1989, held that a roadblock breached the Fourth Amendment.

While conversing with a senior ranking police sergeant in the Farmington High School parking lot, Walters' dispatcher notified him that the Highway Patrol was in pursuit of a motorcycle and that the Highway Patrol requested assistance. Without receiving any information as to the description of either the motorcycle or its operator, Walters left the high school parking lot and drove to the area of the Bray Road/Maple Road intersection with Highway 67. The police sergeant, with whom Walters had been conversing, received the same radio transmissions and did not comment on them to Walters, nor did he accompany Walters as Walters left the parking lot. Upon arriving at Highway 67, Walters positioned his vehicle in the median and waited for any southbound motorcycle to appear, during which time Walters overheard another Missouri State Patrol radio report stating that a motorcycle was being pursued along southbound Highway 67. After Walters idled for two minutes, a southbound motorcycle operated by Donald Hawkins traveled in the left hand lane, closest to the median, emerged from around the

bend and appeared for the first time in Walters' line of sight. No other vehicles were in the vicinity.

Donald Hawkins testified that at no point during his journey along Highway 67 did he hear police sirens or exceed the posted speed limit, nor had he, prior to coming upon Walters' police car, seen activated emergency police lights. As Hawkins traveled in the left passing lane along southbound Highway 67, he came around the bend and proceeded toward the Bray Road intersection with Highway 67. Hawkins first became aware of the police car when the car was thirty yards away. When Hawkins saw the police car, it sat in the cut-through median between southbound and northbound Highway 67 facing west in the direction of, and perpendicular to, the southbound lanes.

Very shortly thereafter, Hawkins noticed that the police car activated its emergency lights and moved. Hawkins thought the vehicle would turn onto the left lane and travel southbound on Highway 67, so Hawkins changed lanes to the right lane. The police car, however, moved across southbound Highway 67, into Hawkins' lane and hit Hawkins' motorcycle and Hawkins' person on the left side. Hawkins, who was wearing a helmet, landed head-first on the concrete, lost consciousness, and came to a stop in a ditch over 165 feet away from the point of collision. Walters testified that it was his intention to stop the motorcycle. Walters also testified that he did not intentionally

attempt to ram the motorcycle with his police car. The Circuit Court of Appeals reversed a summary judgment ruling in favor of the officer on the basis of qualified immunity.

In *Adams v. Speers*, 473 F.3d at 989 (9th Cir. 2007) an officer observed Alan Adams run several stop signs so the officer signaled Adams to stop. Adams did not pull to the side, and at least three more officers entered a chase. The court characterized Adams' driving during the pursuit as nonchalant because Adams drove within the speed limit, stopped for some stop signs, and rolled slowly through others. Officer Paul Speers learned over the radio of the police chase of Adams and joined the pursuit. As he associated with the expedition, Speers retrieved as a passenger a county probation officer who occasionally partnered in apprehending probation violators. Speers parked at a spot he guessed Adams would pass if he continued with his route. When Adams' vehicle reached Speers' location, Speers, without advising other pursuing law enforcement officers of his identity or intentions, tried to ram Adams' vehicle. Speers missed Adams' car so Speers continued at the head of the chase now aided by a police helicopter. Adams exited on an off-ramp, turned left over the freeway, and entered the on-ramp to travel in the opposite direction. Speers successfully rammed Adams with the two cars entangling. A sheriff's department manual characterized the intertwining as a "significant hazard." Adams continued to drive his car and dragged Speers' patrol car for some distance before the cars separated and the chase continued.

61

Paul Speers again butted his patrol car into Alan Adams' vehicle, which action sent Adams' car into a ditch. Despite patrol cars completely surrounding him, Adams reversed his car toward Speers' patrol car. Another officer approached Adams' vehicle, struck the window with his baton, and reached in the car to pepper spray Adams. Before the officer sprayed, Speers exited his patrol car, stood in front of Adams' vehicle, and without warning fired six shots and killed Adams.

An investigation by the sheriff's department found that Paul Speers violated department regulations. Speers lacked permission for the probation officer to ride as a passenger. Speers did not request or receive permission to enter the pursuit. He did not communicate with other officers involved in the chase and did not garner permission to ram Adams' vehicle or to discharge his weapon. The appeals court denied Speers qualified immunity while writing he was an officer "on a mission of his own creation," who abandoned his assignment, retrieved a friend for no apparent reason, barged ahead of officers already engaged in the pursuit, and used force against Adams that created a hazard for both Adams and Speers. The court noted that *Tennessee v. Garner* had decades earlier established a shooting under these circumstances to violate the Fourth Amendment. No officer reasonably acting could have believed he could employ deadly force. Because an officer may not shoot an unarmed, nondangerous suspect to prevent flight, the court denied Paul Speers qualified immunity.

We previously outlined the facts in *Walker v. Davis*, 649 F.3d 502 (6th Cir. 2011). The court denied qualified immunity to Officer Danny Davis because it had been settled law for a generation that, under the Fourth Amendment, when a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. *Tennessee v. Garner*, 471 U.S. at 11 (1985). Thomas Germany posed no immediate threat to anyone as he rode his motorcycle across an empty field in the middle of the night in rural Kentucky. The circuit court did not find relevant the fact that, at the time of Davis' actions, there were few, if any, reported cases in which police cruisers intentionally rammed motorcycles. It was only common sense—and obviously so—that intentionally ramming a motorcycle with a police cruiser involves the application of potentially deadly force.

We previously reported the facts in *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003). Despite some of these facts being disputed, the court accepted the passenger's version of the facts. The immediacy of threat caused by the driver's flight was a disputed material fact that defeated summary judgment on the basis of qualified immunity in favor of the officer. The court ruled that the passenger's Fourth Amendment right was clearly established such that an objectively reasonable officer in Deputy Cox's position would not have believed he was entitled to use deadly force. The court reasoned that the danger presented in this case by the driver's flight was the risk of an accident during the pursuit.

63

No. 34467-3-III

LAWRENCE-BERREY, C.J. (concurring in part) — I concur in the lead opinion on all issues except issues 5 and 6. Therefore, the majority reverses the summary judgment application of the felony bar rule insofar as proximate cause is a question of fact.

My dissenting colleague claims that the felony bar rule does not allow us to inquire whether an intervening act could break the chain of causation. I disagree.

The felony bar rule applies only if the felony "was a proximate cause of the injury or death." RCW 4.24.420. Proximate cause is absent if an intervening act has broken the chain of causation. *See, e.g.*, *Campbell v. ITE Imperial Corp.*, 107 Wn.2d 807, 812-13, 733 P.2d 969 (1987); *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013). Were we to ignore the concept that an intervening act can break the chain of causation, we would be ignoring the meaning of proximate cause, and therefore the statute.

_____
Lawrence-Berrey, C.J.

No. 34467-3-III

KORSMO, J. (dissenting in part) — While I agree that the plaintiff's allegations[1] were sufficient to let the excessive force claim go to trial, I disagree with the majority's reversal of the felony bar ruling. Mr. Sluman presented nothing other than a self-serving denial that the trial court correctly concluded was insufficient. I would affirm that ruling.

As to the excessive force claim, I agree that Mr. Sluman had a clearly recognized right to be free from the use of excessive force during this arrest for eluding a pursuing officer. He endangered no one during the pursuit. The mechanism by which force was applied should not change the analysis. The fact that a "door check" might not have been the subject to a prior § 1983[2] action is not a basis for immunity merely because it was the first time such an action was predicated on that particular use of force. The right was

---

[1] While we must view the evidence in a light most favorable to the losing party in an appeal from an order granting summary judgment, it does not mean we need disparage the other side's evidence or dismiss it because it conflicts with the losing party's view of the facts. That is particularly true where, as here, the issues on appeal revolve around legal issues rather than factual questions. The factual disputes between the parties, while not truly relevant to this appeal, boil down to whether the trooper assaulted the plaintiff with the door of his patrol car or whether Mr. Sluman struck the bridge while attempting to negotiate his way around the patrol vehicle as he accelerated after feigning a stop.

[2] 42 U.S.C. § 1983.

clearly established, even if the particular method by which it was infringed was novel. Accordingly, I agree that summary judgment was improperly granted on that issue.

However, the trial court correctly granted summary judgment on the felony bar statute and dismissed the state law claims. All of the admissible evidence on this issue was on the State's side and there was no material question of fact presented.

There are a few basic principles that should guide this discussion. First among them are those principles involving responses to a motion for summary judgment. A party opposing a motion for summary judgment may not rely on speculation or argumentative assertions that unresolved factual issues remain. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). Likewise, a party may not rely on having its own affidavits accepted at face value. *Id.* Instead, the nonmoving party must set forth specific facts that sufficiently rebut the moving parties' contentions and disclose that a genuine issue as to a material fact exists. *Id.* Ultimate facts or conclusions of fact are insufficient; conclusory statements of fact will not suffice. *Grimwood v. Univ. of Puget Sound, Inc.*, 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988).

Also important is the fact that a party may not contradict itself in order to create a question of material fact. This is a corollary to the principle that one cannot rely on having affidavits taken at face value. It is recognized in a few different contexts, but perhaps the most common—and the one relevant here—is where a self-serving affidavit contradicts prior statements or sworn testimony. *E.g., Overton v. Consol. Ins. Co.*, 145

Wn.2d 417, 429-30, 38 P.3d 322 (2002) (affidavit denying event due to lack of memory

whether it occurred); *McCormick v. Lake Wash. Sch. Dist.*, 99 Wn. App. 107, 111, 992

P.2d 511 (1999) (affidavit contradicting deposition testimony); *Marshall v. AC&S, Inc.*,

56 Wn. App. 181, 184-85, 782 P.2d 1107 (1989) (affidavit contradicting hospital and

Department of Labor record). In such circumstances, the later ("sham") affidavit is

insufficient to overcome the earlier evidence.

Here, the State established its defense. The troopers described the felony flight[3]

(aided by the car video that captured the final moments) and Mr. Sluman confirmed that

he was committing a felony by his recorded admission at the scene and by his guilty plea.

The only contradiction offered in response was Mr. Sluman's deposition testimony that

he did not know the officer was chasing him. That is belied by his statement at the time

of the accident and his guilty plea. Under *Overton* and *Marshall*, the belated change of

---

[3] Although the lead opinion questions whether the speed of the motorcycle during the chase constituted driving in a reckless manner, that fact is well settled in our case law, just as it was under the former reckless driving standard. *E.g.*, *State v. Young*, 158 Wn. App. 707, 723-24, 243 P.3d 172 (2010), *review denied*, 171 Wn.2d 1013 (2011) ("overwhelming" evidence of driving in reckless manner, including speed of 85 m.p.h. in a 30 m.p.h. zone); *State v. Randhawa*, 133 Wn.2d 67, 77-78, 941 P.2d 661 (1997) (proof of sufficiently excessive speed can permit a rational inference of reckless driving); *State v. Hanna*, 123 Wn.2d 704, 713, 871 P.2d 135, *cert. denied*, 513 U.S. 919 (1994) ("the presumed fact of reckless driving more likely than not flows from the proved fact of Hanna's excessive speed."). Our statute is to the same effect. RCW 46.61.465 ("The unlawful operation of a vehicle in excess of the maximum lawful speeds provided in this chapter at the point of operation and under the circumstances described shall be prima facie evidence of the operation of a motor vehicle in a reckless manner by the operator thereof.").

view is insufficient. However, the lead opinion dismisses his admission on the basis that

he was injured, in pain, and not under oath when he made it. The lead opinion also

rejects use of his guilty plea due to reading too much into the decision in *Clark v. Baines*,

150 Wn.2d 905, 84 P.3d 245 (2004). Neither justification has merit.

As the lead opinion properly noted, RCW 4.24.420 provides that it is "a complete

defense" to a damages action that the injured party was engaged in the commission of a

felony and that the felony was the proximate cause of the injury. This is a legislative

policy determination that a person injured in the course of committing a felony is solely

responsible for his injury. As the trial court correctly recognized, it applies here.

There should be no question that the injury occurred at the conclusion of the

incident and resulted from his crime. The causation element is thus easily satisfied.[4] The

remaining question is whether Mr. Sluman was committing a felony at the time of the

accident.

The lead opinion dismisses Mr. Sluman's statement at the scene on the basis that it

was not made under oath. While many previous cases have involved prior statements

made under oath that subsequently were contradicted by a more self-serving version of

the facts, the majority cites no authority requiring that a prior oath is a requirement.

---

[4] Although the concurrence agrees that Mr. Sluman was committing a felony, that opinion believes the "door check" was an intervening cause of injury. That approach appears to write an intentional tort exception into the felony bar rule, something that the legislature did not do.

4

Indeed, the seminal case on this topic appears to be *Marshall*. There, the defendant's affidavit contradicted two official records and was deemed unreasonable and, therefore, insufficient. 56 Wn. App. at 184-85. While *Marshall* itself invalidates the lead opinion's position, there are additional reasons for disregarding the deposition testimony.

A contemporaneous statement typically is considered so reliable that multiple hearsay exceptions exist to allow consideration of that type of evidence. *E.g.*, ER 803(a)(1)-(3) (present sense impressions, excited utterance, then existing condition).[5] For purposes of the "sham affidavit" argument, I do not see why the defendant's contemporaneous nonhearsay statement against his own interest is not considered at least as truthful as one given under oath at some later time. In either circumstance, it should defeat a self-serving version of events given years after the fact. If an earlier statement under oath is sufficient to defeat a later affidavit under the sham affidavit rule, an uncontested and contemporaneous admission against interest should do the same.

That is particularly the case where the earlier statement is clearly reliable. The statement was captured on video. The statement accurately reported that Mr. Sluman had outstanding warrants. He also followed up on that statement by pleading guilty and admitting that he had fled from the troopers.

---

[5] Of course, Mr. Sluman's statement was admissible as a non-hearsay statement against his own interest. ER 801(d)(2).

The lead opinion disregards this evidence due to its reading of *Clark*. That decision does not really aid resolution of this problem. Recognizing the ambiguous nature of an *Alford* plea, the court was very straight-forward in stating its holding: "We hold an *Alford* plea cannot be used as the basis for *collateral estoppel* in a subsequent civil action." *Clark*, 150 Wn.2d at 907 (emphasis added). That holding merely prevents giving the plea *binding* effect in subsequent litigation; the plea still may be admitted into evidence as an admission of the defendant.[6] *State v. Price*, 126 Wn. App. 617, 634-35, 109 P.3d 27 (2005) (citing cases); 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 410.3, at 87 (6th ed. 2016).[7] The judgment itself also is admissible as an exception to the hearsay rule. Tegland, *supra*; ER 803(a)(22) (felony judgment admissible against the former criminal defendant in a subsequent action).

Under Washington law, an *Alford* plea is a guilty plea. *State v. Hubbard*, 106 Wn. App. 149, 156, 22 P.3d 296 (2001). *Accord* CrR 4.2(a) (recognizing the existence of only three types of pleas: "not guilty, not guilty by reason of insanity, and guilty.") Criminal defendants have a right to plead guilty under our court rules. *State v. Martin*, 94 Wn.2d 1, 4, 614 P.2d 164 (1980). The right to plead guilty extends to entering an *Alford* plea.

---

[6] A three justice concurrence noted this fact in *Clark*. 150 Wn.2d at 918 (Ireland, J., concurring).

[7] Even evidence from a criminal case that ended in acquittal can be used in a subsequent civil case. *E.g.*, *In re Det. of Stout*, 159 Wn.2d 357, 377-78, 150 P.3d 86 (2007).

*Hubbard*, 106 Wn. App. at 155-56. Felony judgments are admissible evidence. ER 803(a)(22). Mr. Sluman's plea was properly admitted into evidence.

While not being conclusive due to the holding in *Clark*, the plea and the criminal judgment both are admissible against Mr. Sluman in this civil action.[8] They support Mr. Sluman's initial statement at the time of the accident that he was fleeing police due to the warrants for his arrest. Under the *Marshall* (or "sham affidavit") rule, Mr. Sluman's deposition is insufficient to overcome his earlier statements and admissions that he was running from the police.

The trial court correctly determined that the evidence established the felony bar because there was no reasonable material evidence in opposition. Summary judgment was properly granted on the state law claims. Therefore, I respectfully dissent from the majority's contrary holding.

Korsmo, J.

---

[8] The lead opinion misperceives this point. *Clark* held that an *Alford* plea will not be given *preclusive* effect. 150 Wn.2d at 917 (emphasis added). It did not forbid evidentiary use of an *Alford* plea, and that is all that this opinion does—considers the *Alford* plea and the ensuing judgment along with Mr. Sluman's original statement as part of the evidence that the State used to establish its affirmative defense. It is the sham affidavit rule that, under these facts, renders Mr. Sluman's belated assertions from being considered weighty enough to raise a triable question of fact about his crime. Accordingly, the trial court correctly looked at the evidence before it and saw that the State had established its defense because it had sufficient evidence and Mr. Sluman did not have contrary evidence sufficient to raise a jury question.