IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SARA L. LACY in her personal capacity and as personal representative of the Estate of CECIL D. LACY, JR., deceased,<br><br>    Appellant/Cross Respondent,<br><br>           v.<br><br>SNOHOMISH COUNTY, a political subdivision of the State of Washington;<br><br>    Respondent/Cross Appellant,<br><br>MICHAEL JOHNSEN, in his personal capacity; TYLER GROSS, in his personal capacity,<br><br>    Defendants. | No. 79294-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — "[I'm] freaking out. . . . [I] can't breathe," Cecil Lacy Jr.[1] exclaimed, as he lay face down with Snohomish County Sheriff Deputy Tyler Pendergrass's weight on his back. Deputy Pendergrass responded, "'Cecil, you're breathing. You're talking. You're breathing. Just focus on deep breaths[ ] . . . and calm down.'" All the while, Deputy Pendergrass maintained pressure on Cecil's back. Cecil, who was experiencing an episode of excited

---

[1] For clarity, we use the first names of Cecil Lacy Jr. and his wife, Sara Lacy.

Citations and pin cites are based on the Westlaw online version of the cited material.

delirium, quickly became unconscious. Following attempts to provide aid, Cecil was declared dead at the scene. The entire interaction—from when Deputy Pendergrass first approached Cecil to when Cecil became unconscious—lasted less than nine minutes.

Following Cecil's death, his wife, Sara Lacy, sued Snohomish County (County) alleging, among other claims, battery and negligence. After Sara rested her case, the trial court granted the County's motion for a directed verdict with regard to all of Sara's claims. Sara appealed.

We conclude that Sara presented insufficient evidence for a reasonable juror to find that proximate cause existed for any of the negligence theories that she asserted. Accordingly, the trial court did not err by entering a directed verdict on those theories. However, because Sara's police practices expert testified that a reasonable officer would have recognized that Cecil was suffering from excited delirium, avoided applying pressure to Cecil's back while he was in a prone position, and removed the pressure immediately after Cecil said he could not breathe, the trial court erred when it entered a directed verdict with regard to Sara's battery claim. Therefore, we reverse in part and remand for trial on the battery claim.

## FACTS

The testimony and exhibits offered at trial provide the basis for this statement of facts. And because our review is of a directed verdict, we present the facts in the light most favorable to Sara.

Around 9:30 p.m. on September 18, 2015, 46-year-old Cecil, a Tulalip

Tribal member, left his home in Tulalip, Washington, and began walking on State Route 529, also known as Marine View Drive. At 9:47 p.m., dispatch for the County received a call about a potential road hazard: a man walking on the side of the road. Deputy Pendergrass and Tulalip Tribal Police Sergeant Michael Johnsen and Officer Tyler Gross (collectively officers) responded to the call. Deputy Pendergrass arrived on the scene at approximately 10:06 p.m. When Deputy Pendergrass arrived, Officer Gross was parked on the shoulder of the road but had been instructed by Sergeant Johnsen, his training officer, to wait to approach Cecil. Sergeant Johnsen arrived shortly after Deputy Pendergrass.

At around 10:07 p.m., Deputy Pendergrass exited his vehicle. As he approached Cecil, Cecil walked toward him, and Deputy Pendergrass later testified that at the time, he was afraid Cecil was going to attack him. Deputy Pendergrass radioed for backup and commanded Cecil to stop. Cecil complied. When asked what he was doing, Cecil told Deputy Pendergrass that "he was out for a nightly exercise walking down the roadway." Officer Gross joined Deputy Pendergrass and eventually so did Sergeant Johnsen.

In Sergeant Johnsen's body camera footage later admitted at trial, Cecil can be seen unable to stand still and speaking rapidly. Cecil explained to Sergeant Johnsen that he suffered from mental health conditions that made it difficult for him to stand still.[2] At that point, Sergeant Johnsen said to Deputy Pendergrass, "We can take him, if that's cool with you." Deputy Pendergrass

---

[2] Each officer testified at trial that Cecil's behavior led them to believe that he was under the influence of methamphetamine.

agreed. The officers then persuaded Cecil to receive a ride home from Sergeant Johnsen. But as Sergeant Johnsen attempted to handcuff Cecil, Cecil panicked and became agitated. Cecil repeatedly asked the officers to call his wife to come pick him up. The officers explained to Cecil that they could either take him home or to a hospital and that he was not under arrest. And Deputy Pendergrass pointed his stun gun at Cecil and told him: "I want you to relax or you're going to get tased." Eventually, Cecil calmed down and asked to be handcuffed in front of his body because his "shoulders are really bad." Sergeant Johnsen agreed, handcuffed Cecil, and frisked him for weapons.

Upon finding no weapons, at around 10:12 p.m., the officers walked Cecil to Officer Gross's patrol vehicle. On the way to the vehicle, Cecil expressed serious concern about going to the hospital because he had experienced abuse on multiple occasions while being treated at mental health facilities. Cecil ultimately got into the vehicle. He remained in the vehicle for a moment but then quickly exited "the vehicle and pushed [Officer Gross] aside" in an "attempt[ ] to get away from" the officers. In the video footage, one officer can be heard repeatedly saying, "Now, we're gonna take you to the hospital." Cecil responds, "Take me to the hospital" and pleads with the officers not to put him in the patrol vehicle. Nonetheless, the officers calmed Cecil down, and Cecil got back into the vehicle.

Cecil's composure was short-lived. At around 10:13 p.m., a struggle began when "Officer Gross and Sergeant Johnsen went to shut the vehicle's door" and Cecil "jumped out swinging his arms wildly . . . causing him to hit

Sergeant Johns[e]n [and] knock[ ] his bodycam[era] off." The officers attempted to subdue Cecil and "to get him back into the patrol car," but Cecil "essentially drug [Sergeant Johnsen], Officer Gross and Deputy Pendergrass to the front of the vehicle." Unable to gain control of Cecil, Deputy Pendergrass deployed his stun gun on Cecil's upper right shoulder in drive stun mode.[3] The stun gun was ineffective, and Deputy Pendergrass lost his stun gun as the struggle continued.

Sergeant Johnsen performed a leg sweep, a maneuver by which Sergeant Johnsen brought Cecil to the ground. Cecil ended up in a prone position in the ditch beyond the shoulder of the road. Officer Gross attempted to restrain Cecil by crossing Cecil's feet and pressing them up to Cecil's buttocks; Sergeant Johnsen restrained Cecil's handcuffed hands above Cecil's head; and Deputy Pendergrass applied pressure "somewhere between Mr. Lacy's buttocks and his shoulder blades," "holding [Cecil] down." At some point during the struggle, Deputy Pendergrass radioed to "close the air," which meant that an incident was ongoing.

While the officers attempted to subdue Cecil, Cecil said that he was "struggling to breathe," was "freaking out," and could not breathe. The officers commanded Cecil to calm down and take a breath. Deputy Pendergrass continued to put weight on Cecil's back, and "[Cecil] continued to struggle" for about 10 or 15 seconds. Cecil became unresponsive at approximately 10:14 p.m. Deputy Pendergrass testified that he attempted to rouse Cecil once

---

[3] Drive stun mode is a function where an officer presses the stun gun directly onto the individual's skin and activates the stun gun.

he became unresponsive and then moved his weight off of Cecil's back. Thereafter, the officers rolled Cecil over and once more, without success, attempted to obtain a response from Cecil. At this point, Deputy Pendergrass called for "'one more unit.'"

At 10:17 p.m., Deputy Pendergrass called to expedite aid, and Sergeant Johnsen started checking Cecil's vitals. Sergeant Johnsen did not start cardiopulmonary resuscitation (CPR) because he could not find Cecil's pulse. At the same time, Deputy Pendergrass returned to his vehicle to look for a CPR mask. And at 10:18 p.m., the officers were "still working on [Cecil's] breathing status." When Deputy Pendergrass returned to Cecil at around 10:19 p.m., he "rechecked for vitals, confirmed that there was no pulse and no breathing," and started CPR.

At 10:22 p.m., Tulalip Bay Fire Department emergency medical technicians (EMTs) arrived on the scene and began to administer aid. At 10:26 p.m., CPR was still in progress, and the officers made an additional request for "aid to exp[e]dite." At 10:29 p.m., 23 minutes after Deputy Pendergrass first arrived on scene and 12 minutes after Deputy Pendergrass called for aid, Marysville Fire Department paramedics arrived and immediately began providing aid.

Cecil was pronounced dead at the scene. The County medical examiner's officer stated that Cecil died from "cardiac arrhythmia due to acute drug intoxication due to methamphetamine [and that] other significant conditions contributory to death were hypertension, dilated cardiomyopathy, schizophrenia,

6

bipolar disorder, morbid obesity[,] and physical struggle with law enforcement."

PROCEDURE

In September 2016, Sara, in her individual capacity and as personal representative of Cecil's estate, sued the County. In her second amended complaint, Sara asserted five claims for relief: (1) negligence and gross negligence, (2) false imprisonment, (3) battery, (4) negligent use of excessive force, and (5) outrage. In one of Sara's negligence theories, she argued that the County failed to train or supervise Deputy Pendergrass. Sara also generally alleged that the "County is[ ] and was . . . responsible for the actions or inactions[ ] . . . of the Snohomish County Sheriff's Office and its employees, including" Deputy Pendergrass and that Deputy "Pendergrass w[as] acting within the course and scope of [his] employment during the incident that gave rise to [the] complaint." In its answer to Sara's complaint, the County admitted this allegation.

During discovery, Sara's police practices expert, Susan Peters, opined in her expert report as to Deputy Pendergrass's failure to stage aid, the County's negligent supervision and training, and Deputy Pendergrass's failure to recognize Cecil's heightened risk factors when he restrained Cecil. According to Peters' report, she relied on, among other things, the Snohomish County Sheriff's Office (SCSO) policies and the International Association of Chiefs of Police training guidelines. In her deposition, Peters testified that she relied on law enforcement training to inform the standards that she utilized in evaluating this case.

The County later moved for the summary judgment dismissal of all of

Sara's claims. With regard to Sara's negligence claims, the County argued that the public duty doctrine[4] barred the claims. And in response to the County's motion, Sara voluntarily dismissed her negligent training and supervision claim. The court granted the County's motion as to Sara's outrage claim. However, it denied the motion with regard to Sara's claims of false imprisonment, battery, and the remaining negligence theories.

Prior to trial, the County and Sara each moved to exclude evidence, including some testimony. Pursuant to the motions, the court excluded any reference to the SCSO policies, reasoning that the SCSO policies were not relevant to whether Deputy Pendergrass was negligent. It also excluded references to Deputy Pendergrass's expired CPR card.

Sara's trial brief advanced three negligence theories: Deputy "Pendergrass was negligent when he (1) failed to stage EMT while [Cecil] was in his custody and exhibiting clear signs of excited delirium, (2) approached and detained [Cecil] in a manner that caused a reasonably foreseeable use of excessive force, and (3) failed to promptly initiate CPR." With regard to her battery claim, Sara argued that "the use of prone position holds on persons with certain risk factors—all of which [Cecil] exhibited, *e.g.,* overweight, drug intoxication, excited delirium—constitutes the use of deadly force." The County's trial brief argued that Sara's trial brief presented negligence theories that she had

---

[4] The public duty doctrine limits liability in negligence for the government when the duty owed to the individual complainant is a duty owed to the general public. Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 549, 442 P.3d 608 (2019).

not pleaded in her second amended complaint. The trial court disagreed with the State and agreed with Sara that she sufficiently pleaded the three negligence theories.

Trial began on October 16, 2018, and all three officers recounted the incident. Additionally, Dr. Jared Strote, Sara's emergency medicine expert, testified regarding the cause of Cecil's death, proper CPR techniques, available lifesaving aid, and excited delirium symptoms. Dr. Bennet Omalu testified as Sara's medical expert. He asserted that Cecil's cause of death was positional asphyxia resulting from Deputy Pendergrass's prone positioning of Cecil and placement of weight on his back, but that "[o]ther contributory factors to death were [Cecil's] obesity[,] . . . [h]is amphetamine intoxication[, and] hypertensive cardiovascular disease."

Peters also testified. But before she did, Sara moved to admit a PowerPoint exhibit containing policy excerpts from national organizations and other jurisdictions that addressed excited delirium. The court denied Sara's motion, finding that the exhibit did not conform to the best evidence rule. It also ruled that the national policies were not relevant to whether Deputy Pendergrass acted negligently and that the County had no notice of Peters' potential reliance on such policies.

After Sara rested her case, the County moved for a directed verdict on all of Sara's claims. The trial court granted the County's motion, concluding that Sara failed to present sufficient evidence of proximate cause with regard to her negligence theories, failed to provide evidence that Deputy Pendergrass used

9

excessive force, and provided no evidence to support her claim of false imprisonment. Sara appeals the court's decision with regard to her negligence theories and battery claim.

ANALYSIS

Directed Verdict

We review a trial court's order granting a CR 50 motion for a directed verdict de novo.[5] HBH v. State, 197 Wn. App. 77, 85, 387 P.3d 1093 (2016), aff'd, 192 Wn.2d 154, 429 P.3d 484 (2018). Under CR 50(a)(1), "[i]f . . . a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find . . . for that party with respect to that issue," then the court may grant a directed verdict against that party "on any claim . . . that cannot under the controlling law be maintained without a favorable finding on that issue." In other words, to grant a motion for a directed verdict, the court must conclude, "'as a matter of law, that there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.'" Paetsch v. Spokane Dermatology Clinic, P.S., 182 Wn.2d 842, 848, 348 P.3d 389 (2015) (quoting Indus. Idem. Co. of Nw. v. Kallevig, 114 Wn.2d 907, 915-16, 792 P.2d 520 (1990)).

In ruling on a CR 50 motion, "'the evidence [must] be interpreted most strongly against the moving party and in the light most favorable to the

---

[5] We note that in 1993, CR 50 was amended to abandon the term directed verdict for the more general term judgment as a matter of law. 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 24:2, at 72 (3d ed. 2018). Because the parties refer to the motion as one for a directed verdict, we utilize that term throughout.

opponent.'" Lock v. Am. Family Ins. Co., 12 Wn. App. 2d 905, 925, 460 P.3d 683 (2020) (quoting Goodman v. Goodman, 128 Wn.2d 366, 371, 907 P.2d 290 (1995)). To this end, the moving party "'admits the truth of the opponent's evidence and all inferences that can be reasonably drawn therefrom.'" Lock, 12 Wn. App. 2d at 925 (quoting Goodman, 128 Wn.2d at 371).

Here, Sara contends that the trial court erred in granting a directed verdict on her negligence theories and battery claim. As further discussed below, we conclude that the trial court did not err with regard to Sara's negligence theories because Sara did not present sufficient evidence of cause in fact. But with regard to Sara's battery claim, Sara presented sufficient evidence for a reasonable juror to find—by the evidence or reasonable inferences therefrom—that Deputy Pendergrass's use of force was excessive or unnecessary.

*Negligence*

Sara contends that the trial court erred when it entered a directed verdict on her negligence claims. Given the negligence theories Sara alleged and tried, we disagree.

As an initial matter, "[a] party who does not plead a cause of action or theory of recovery cannot finesse the issue by later inserting the theory into trial briefs and contending it was in the case all along." Dewey v. Tacoma Sch. Dist. No. 10, 95 Wn. App. 18, 26, 974 P.2d 847 (1999).

While Sara's original complaint pleaded a broad theory of negligence involving a totality of the circumstances claim, her trial brief included three distinct theories of negligence: (1) failure to immediately stage lifesaving aid,

(2) negligent escalation of the situation in a manner leading to the use of excessive force, and (3) failure to properly administer CPR. And when the County asserted that Sara did not sufficiently plead these theories, Sara argued to the contrary. When the trial proceeded, the parties tried these theories. For this reason, the issues tried cannot be finessed into the broad negligence theory now asserted on appeal. Accordingly, we analyze the propriety of the directed verdict based on the three distinct negligence theories that Sara proffered in her trial brief and presented at trial. See CR 15(b); see also Dewey, 95 Wn. App. at 22-23, 26 (holding that where the plaintiff sufficiently pleaded two wrongful discharge theories but presented a third new theory in response to the defendant's motion for summary judgment, the third theory was not sufficiently pleaded or, later, tried by implication).

"A negligence claim requires the plaintiff to establish (1) the existence of a duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause between the breach and the injury." Behla v. R.J. Jung, LLC, 11 Wn. App. 2d 329, 334, 453 P.3d 729 (2019), review denied, 460 P.3d 180 (2020). "Proximate cause consists of two elements: cause in fact and legal causation." Sluman v. State, 3 Wn. App. 2d 656, 701, 418 P.3d 125, review denied, 192 Wn.2d 1005 (2018). "Cause in fact concerns the 'but for' consequences of an act: those events that the act produced in a direct, unbroken sequence, and that would not have resulted had the act not occurred." Sluman, 3 Wn. App. 2d at 701 (internal quotation marks omitted) (quoting Smith v. Dep't of Corr., 189 Wn. App. 839, 850, 359 P.3d 867 (2015)). "Legal causation rests on considerations

12

of logic, common sense, policy, justice, and precedent as to how far the defendant's responsibility for the consequences of its actions should extend." Sluman, 3 Wn. App. 2d at 701.

For purposes of our analysis, we assume that Deputy Pendergrass owed a duty to Cecil and that he breached that duty in the three ways Sara alleged in her trial brief.[6] And clearly, the resulting injuries were Cecil's death and the monetary and nonmonetary consequences thereof. We also assume that Sara presented sufficient evidence to support a finding that each breach by Deputy Pendergrass was the legal cause of Cecil's death. But because Sara failed to present evidence sufficient for a reasonable juror to find that any of the breaches alleged in her trial brief were, in an unbroken sequence of events, the direct, but for cause of Cecil's death, we conclude that the trial court did not err in entering a directed verdict on Sara's negligence theories.

To prevail on the issue of cause in fact, Sara was required to "supply proof for a reasonable person to, 'without speculation,' infer that the act of the other party *more probably than not* caused the injury." Behla, 11 Wn. App. 2d at 335 (emphasis added). "As a determination of what actually occurred, cause in fact is generally left to the jury." Hartley v. State, 103 Wn.2d 768, 778, 698 P.2d 77 (1985). But "[c]ause-in-fact may be determined as a matter of law if the causal connection is so speculative and indirect that reasonable minds could not differ."

---

[6] Sara claims that the trial court erred when it excluded evidence of Deputy Pendergrass's expired CPR certification. Because we assume that Deputy Pendergrass breached the required standard of care and because Sara proffered the CPR certification to prove that element, we do not address this claimed error.

Doherty v. Mun. of Metro. Seattle, 83 Wn. App. 464, 469, 921 P.2d 1098 (1996).

In her first negligence theory, Sara alleged that Deputy Pendergrass breached the standard of care by failing to stage aid immediately upon interacting with Cecil. Accordingly, Sara had to present sufficient evidence that Deputy Pendergrass's failure to call for aid was the cause in fact of Cecil's death. To this end, Peters testified that a reasonable officer would have recognized Cecil's signs and symptoms as consistent with excited delirium. A reasonable officer, therefore, would have identified the situation as a medical emergency and immediately staged medical aid. Additionally, Dr. Strote testified that Cecil suffered from excited delirium and that for individuals experiencing excited delirium, paramedics—but not EMTs who arrived on the scene first—can administer chemical sedation and advanced cardiac life support that could help revive the individual.

While it is unclear exactly when Cecil became unconscious, the officers estimated that he stopped struggling at around 10:14 p.m. or about 30 seconds after he was taken to the ground. According to the computer aided dispatch (CAD) reports[7] admitted at trial, the officers called for aid at 10:17 p.m., and the Marysville Fire Department paramedics arrived 12 minutes later. Sara contends that the CAD reports may be inaccurate and that had Deputy Pendergrass called immediately upon seeing Cecil at 10:06 p.m., the paramedics could have arrived as early as 10:19 p.m. But regardless of the reports' potential inaccuracies, Sara

---

[7] A CAD report provides timestamps for events relayed from the officer or medical aid to dispatch.

presented no evidence that the paramedics could have successfully revived Cecil. To the contrary, even assuming that the paramedics were able to immediately administer aid, Dr. Strote only testified that the aid "give[s] the person every chance they have" to survive. Thus, even if aid were there when Cecil became unconscious, the paramedics could merely provide medical attention that gave him the best chance of survival, not a probable chance.

Sara contends that "Dr. Strote opined that 'had EMS [(emergency medical services)] been called earl[ier] he would not have died more likely than not.'" However, the entirety of Dr. Strote's testimony asserts that a sequence of events, including Cecil not having the encounter with the officers at all, the officers not restraining Cecil, and EMS being called earlier, more likely than not caused Cecil's death. This chain is too speculative for a reasonable juror to find for Sara on the issue of proximate cause.

In short, taking the evidence and all reasonable inferences most strongly in Sara's favor, there is not sufficient evidence from which a reasonable juror could have inferred, without speculating, that had Deputy Pendergrass called for aid when he first observed Cecil and witnessed his behavior, paramedics would have been able to revive Cecil. Therefore, the trial court did not err when it granted the County's motion on Sara's first negligence theory.

In her second negligence theory, Sara alleged that Deputy Pendergrass breached the standard of care by negligently escalating or failing to properly de-escalate the situation such that the use of excessive force was reasonably

foreseeable.[8]  Accordingly, Sara had to present sufficient evidence that Deputy Pendergrass's escalation of or failure to de-escalate the situation was the cause in fact of Cecil's death.  To this end, Sara presented evidence that Deputy Pendergrass escalated the situation by threatening to deploy his stun gun if Cecil did not calm down.  And Peters testified that Deputy Pendergrass should have identified the situation as a medical emergency, "[d]e-escalate[ed] the situation," avoided making "any threats towards" Cecil, and tried "to calm him."  Similarly, Dr. Strote testified that numerous factors ultimately led to Cecil's death, including not doing everything possible to avoid restraining Cecil and to avoid increasing Cecil's agitation.  But beyond speculation, there was no evidence that Cecil would not have reacted the way he did—i.e., by panicking and exiting the vehicle—had Deputy Pendergrass used appropriate de-escalation techniques.  Indeed, Peters testified only that had Deputy Pendergrass immediately called for aid and then de-escalated the situation, "we wouldn't have been where we are *maybe* today."

In short, the testimony presented at trial provides only that *maybe* de-escalation could have prevented Cecil's death.  Sara presented no evidence from which a reasonable juror could find, without speculating, that had Deputy Pendergrass used proper de-escalation tactics and not escalated the situation, Cecil more likely than not would have survived.  Therefore, the trial court did not

---

[8] Sara's trial brief alleged that Deputy Pendergrass escalated the situation by "for instance, drawing '[his] taser and advis[ing Mr. Lacy] that if he can't calm down, that he's going to get tased' and otherwise escalating . . . the situation with a person he knew was mentally ill."

16

err by entering a directed verdict on Sara's second negligence theory.

Sara disagrees and points to Dr. Omalu's testimony that the pressure applied to Cecil's back by Deputy Pendergrass "compromised [Cecil's] respiration, . . . resulted in asphyxia injury to the brain, [and] resulted in [Cecil's] death."  In other words, Sara contends that Deputy Pendergrass's use of force caused Cecil's death.  But Sara specifically based her second negligence theory on Deputy Pendergrass's breach by failure to de-escalate, not by negligent use of excessive force.  And Dr. Omalu did not testify that Deputy Pendergrass's failure to de-escalate the situation caused the mechanical positional asphyxia.  Indeed, *no* expert testified that Deputy Pendergrass's actions escalating the situation more probably than not caused the struggle, the asphyxia, and, ultimately, Cecil's death.  Thus, even taking as true that Cecil died from mechanical positional asphyxia caused by Deputy Pendergrass, Sara failed to provide evidence for a reasonable juror to find the requisite causal link between escalation or failure to de-escalate and Cecil's death.

In her third negligence theory, Sara alleged that Deputy Pendergrass breached the standard of care by failing to properly administer CPR.[9]  Accordingly, Sara was required to show that Deputy Pendergrass's failure to immediately administer CPR was the cause in fact of Cecil's death.  To this end, Dr. Strote testified that every minute after an individual goes into cardiac arrest and CPR is not administered, there is a "large decrease in the chance that

---

[9] In her reply to the County's motion for a directed verdict, Sara contended that she had proposed a loss of chance theory.  However, because neither her complaint nor her trial brief puts forth such a theory, we do not review it.

they're ever going to be brought back with any kind of meaningful recovery." But he explained that "CPR is not done to bring someone back; that is relatively rare" and that CPR is "basically a bridge to" allow paramedics to arrive and administer "medicines or a defibrillator, so that the heart can be shocked in those circumstances." He testified that "[o]*ccasionally* doing CPR will bring people back without any other intervention."

Neither Dr. Strote nor Dr. Omalu testified that had chest compressions begun as soon as Cecil became unresponsive, it was more probable than not that Cecil would have survived. Specifically, even with the alleged six-minute gap between when Deputy Pendergrass notified dispatch that an incident was ongoing and when he began chest compressions, CPR only "[o]ccasionally" saves someone's life. As such, the evidence presented was too speculative for a reasonable juror to find the requisite causal link between Deputy Pendergrass's alleged breach in failing to begin chest compressions and Cecil's death. Therefore, the trial court did not err by granting the County's motion for a directed verdict with regard to Sara's third negligence theory.

In sum, the only negligence theories that Sara argued in her trial brief and presented at trial were that Deputy Pendergrass breached the standard of care by (1) failing to immediately call for aid, (2) failing to de-escalate the situation or escalating the situation, and (3) failing to immediately begin chest compressions. Even when viewed in the light most favorable to Sara, the evidence admitted at trial was insufficient for a reasonable juror to conclude by inference or otherwise, and without speculating, that any of these alleged breaches more probably than

not directly caused Cecil's death. Therefore, we conclude that as a matter of law, Sara's evidence was insufficient to support a finding on the issue of cause in fact and that the trial court did not err by dismissing her negligence claims.

Sara disagrees and claims that she asserted below a broad theory of negligence. Specifically, she contends that she asserted that "the unintentional conduct preceding any use of force fell below the applicable standard of care, and that such conduct caused the reasonably foreseeable use of excessive, and ultimately deadly, force." To this end, she relies on Beltran-Serrano v. City of Tacoma, 193 Wn.2d 537, 442 P.3d 608 (2019), for the proposition that "Washington law permits a negligent use of force claim under a totality of the circumstances standard."

In Beltran-Serrano, Cesar Beltran-Serrano—whom a city of Tacoma police officer shot multiple times after a social contact escalated to the use of deadly force—sued the city for negligence, and assault and battery. 193 Wn.2d at 540. Beltran-Serrano premised his negligence claims on the theory that the officer "failed to follow police practices calculated to avoid the use of deadly force." Beltran-Serrano, 193 Wn.2d at 544. The trial court granted the city's motion for summary judgment on Beltran-Serrano's negligence claims and certified to our Supreme Court the question of whether the officer owed "'a duty of reasonable care . . . when using deadly force.'" Beltran-Serrano, 193 Wn.2d at 542-43. The court held that because Beltran-Serrano's negligence claims arose out of the officer's direct and affirmative interactions with him, the officer owed him a duty in tort to exercise reasonable care. Beltran-Serrano, 193 Wn.2d at 551-52.

Sara's reliance on Beltran-Serrano is misplaced for two reasons. First, in Beltran-Serrano, the court did not address the merits of Beltran-Serrano's claims or review whether he presented evidence sufficient for a reasonable juror to find for him on the elements of negligence. Second, the only theories that Sara argued in her trial brief were the three discussed above. Indeed, Sara argued to proceed to trial on the three separate theories, not the broad theory proffered in her complaint. Our review is limited to those three distinct theories. See Cano-Garcia v. King County, 168 Wn. App. 223, 248, 277 P.3d 34 (2012) (refusing to address a new theory of negligence where the plaintiff raised the theory in his complaint but failed to raise the theory in opposition to summary judgment because "[i]ssues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal"). Thus, Beltran-Serrano is not persuasive.

Finally, Sara contends that in granting the County's motion for a directed verdict, the trial court improperly weighed evidence, made credibility determinations, and failed to take Sara's presented evidence as true. In some regards, we agree. For example, the trial court failed to take the evidence in the light most favorable to Sara when it found that Cecil "died of heart arrhythmia and methamphetamine toxicity at the scene." To the contrary, Dr. Omalu testified that Cecil died from mechanical positional asphyxia. Additionally, the trial court erred when it found that Sara presented no evidence that Deputy Pendergrass escalated the situation. In fact, Sara presented evidence that Deputy

Pendergrass escalated the situation when he yelled at Cecil, "I want you to relax or you're going to get tased." See Goodman, 128 Wn.2d at 371 (The evidence and all reasonable inferences therefrom must "be interpreted most strongly against the moving party and in the light most favorable to the opponent."). Nonetheless, because our review is de novo and because we have viewed the evidence in the light most favorable to Sara without making credibility determinations or weighing the evidence, the trial court's errors do not require reversal.[10]

*Battery*

Sara asserts that the trial court erred when it entered a directed verdict on her battery claim. We agree.

"A battery is a '[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff . . . to suffer such a contact.'" McKinney v. City of Tukwila, 103 Wn. App. 391, 408, 13 P.3d 631 (2000) (first alteration in original) (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 9, at 39 (5th ed. 1984)). Washington recognizes a cause of

---

[10] Given that we affirm the trial court's directed verdict on Sara's negligence theories, we need not discuss the County's cross appeal, which contends that Sara's negligence claims were barred by the public duty doctrine and thus should have been dismissed on summary judgment. See, e.g., Schreiner Farms, Inc. v. Am. Tower, Inc., 173 Wn. App. 154, 164, 293 P.3d 407 (2013) (refraining from reaching the respondents' cross appeal after dismissing the appellant's suit as time barred). We also do not address the County's supplemental authority citing our unpublished decision, Mancini v. City of Tacoma, No. 77531-6-I (Wash. Ct. App. May 13, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/775316.pdf, review granted, 194 Wn.2d 1009 (2019). See GR 14.1(a), (c) (We have discretion whether to consider citation to unpublished opinions.).

action for battery by a police officer when "unnecessary violence or excessive force is used in accomplishing [an] arrest." Boyles v. City of Kennewick, 62 Wn. App. 174, 176, 813 P.2d 178 (1991) (emphasis omitted); see also Staats v. Brown, 139 Wn.2d 757, 780-81, 991 P.2d 615 (2000) (holding that state qualified immunity does not bar state claims for assault and battery when excessive force is used in effectuating an arrest). Whether or not a police officer can be held liable for battery depends in part on whether the officer's actions were reasonable. See Staats, 139 Wn.2d at 778 (Under state law, an officer is entitled to qualified immunity "'when the officer (1) carries out a statutory duty, (2) according to procedures dictated to [them] by statute and superiors, and (3) *acts reasonably*.'" (emphasis added) (quoting Guffey v. State, 103 Wn.2d 144, 152, 690 P.2d 1163 (1984))). "Determining whether a police officer's use of force was reasonable or excessive requires careful attention to the facts and circumstances of each particular case." Sluman, 3 Wn. App. 2d at 674.

As to Deputy Pendergrass's alleged battery against Cecil, Dr. Omalu testified that "[a]ll you need to suffer asphyxia is ten pounds of pressure," but here, "significant amounts of pressure were applied on the trunk of [Cecil] . . . by one police officer, which increases intrathoracic pressure, which compromised [Cecil's] respiration, which resulted in asphyxia injury to the brain, which resulted in [Cecil's] death." Based on this testimony, a reasonable juror could find that Deputy Pendergrass's intentional act of pressure on Cecil's back caused Cecil's death and that, therefore, Deputy Pendergrass committed battery against Cecil.

As to reasonableness, when viewed in the light most favorable to Sara,

22

the evidence was sufficient for a reasonable juror to find that Deputy Pendergrass acted unreasonably under the circumstances. Specifically, Officer Gross testified that he did not believe Cecil was trying to harm him or the other officers, only that Cecil was trying to escape. No officer testified that Cecil threatened the officers or that he was under arrest, and the officers had no reason to believe that Cecil was armed, as Sergeant Johnsen had frisked Cecil and found no weapons.

Peters also provided testimony on the reasonableness of Deputy Pendergrass's actions. She testified that a reasonable officer would have recognized that Cecil was suffering from excited delirium and would not have escalated the situation or used the type of force Deputy Pendergrass employed on Cecil. To this end, Peters testified that an officer should not put a human being who has certain risk factors, or is experiencing excited delirium, in a "[p]rone position with weight on [their] back" and should "avoid pressure on the individual's chest area."[11] Such an individual, Peters opined, is "at a risk for in-custody death or death shortly after an event such as a struggle or a prolonged struggle." Here, the officers testified that Deputy Pendergrass placed weight on Cecil's back while Cecil was restrained in a prone position.

Peters also testified that an officer should be able to view the individual's face and, when the individual says that they cannot breathe, should "*alleviate that pressure immediately* and roll the individual onto either their side or in a

---

[11] In addition, Dr. Omalu testified that Cecil's obesity and hypertensive cardiovascular disease created a heightened risk of asphyxia.

seated position." But the officers testified that even after Cecil said he could not breathe, Deputy Pendergrass kept weight on Cecil's back and that they did not immediately move Cecil from the prone position.

In short, Sara presented evidence from which a reasonable juror could have found or inferred that Deputy Pendergrass used unnecessary or excessive force to restrain a human being in Cecil's state of mind and circumstance. And based on this testimony, we cannot conclude, as a matter of law, that Deputy Pendergrass acted reasonably when he applied and maintained pressure on the back of a handcuffed, unarmed, mentally ill, and agitated human being who was in a prone position, exclaiming that he could not breathe. See, e.g., Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058-60 (9th Cir. 2003) (holding that two officers maintaining pressure on a prone positioned, mentally ill, handcuffed, and compliant individual "who was being taken into custody to prevent injury to himself" was not reasonable).[12] That determination should have been left to the jury. See Sluman, 3 Wn. App. 2d at 674 (Assessing the reasonableness of an officer's actions "nearly always requires a jury to sift through disputed factual contentions to draw inferences therefrom and to assess [the] credibility of witnesses."). Therefore, the trial court erred in granting the

---

[12] The County contends that federal case law is irrelevant in the context of Sara's battery claim. However, we have looked to federal law to determine whether an officer acted reasonably and therefore whether he could be held liable for a state law battery claim. See, e.g., Gallegos v. Freeman, 172 Wn. App. 616, 641-42, 291 P.3d 265 (2013) (holding that because an officer's actions were reasonable under Fourth Amendment standards for excessive force, the actions also were reasonable under state law and dismissing the state law battery claim).

24

County's motion for directed verdict with regard to Sara's battery claim.

The County disagrees and asserts that Peters did not provide testimony that Deputy Pendergrass's use of force was unnecessary or "overly aggressive." But as discussed above, Peters testified that a reasonable officer would have recognized that Cecil was experiencing excited delirium, that the use of prone positioning on such a human being is improper, and that a reasonable officer should immediately remove pressure when an individual is struggling to breathe. Therefore, although Peters did not use the specific phrases "unnecessary" or "overly aggressive," a reasonable juror could nevertheless have inferred from Peters' and the officers' testimony that Deputy Pendergrass acted unreasonably. See Reyes v. Yakima Health Dist., 191 Wn.2d 79, 89, 419 P.3d 819 (2018) (An expert is not required "to aver talismanic magic words.").

Finally, the County points to the officers' testimony that the use of force was reasonable and to Deputy Pendergrass's testimony that he was concerned for his and Cecil's safety because the altercation occurred next to a busy road late at night. But Sara presented evidence from which a reasonable juror could find or infer that Deputy Pendergrass's actions were inappropriate in the situation. And because we take all reasonable inferences and evidence in Sara's favor, we are not persuaded that a directed verdict was proper. See Schmidt v. Coogan, 162 Wn.2d 488, 493, 173 P.3d 273 (2007) ("An order granting [a motion for a directed verdict] should be limited to circumstances in which there is no doubt as to the proper verdict.").

For the foregoing reasons, we conclude that the trial court erred when it

granted the County's motion for a directed verdict on Sara's battery claim.

Evidentiary Rulings

Because we remand Sara's battery claim for trial, we review Sara's assertions that the trial court erred in excluding two categories of policy evidence. We review the court's decision to exclude evidence based on relevance for an abuse of discretion. State v. Scherf, 192 Wn.2d 350, 387, 429 P.3d 776 (2018).

First, the trial court excluded evidence of the SCSO policies or lack thereof. To that end, at the hearing on the parties' motions in limine, Sara argued that the following facts were relevant to her negligence and battery claims: (1) the SCSO did not have a policy on excited delirium and (2) its policy on dealing with mentally ill individuals did not address excited delirium. She argued that they showed that "the [C]ounty didn't . . . even tangentially educate [Pendergrass] on what he needed to do in this certain situation" and that "Snohomish County didn't train him on" excited delirium. On appeal, Sara similarly asserts that the policies are evidence of "Snohomish County's negligence." In other words, Sara argued only that the SCSO policies were relevant to the *County's* negligence in failing to train Deputy Pendergrass.[13] But because Sara voluntarily dismissed her negligent training claim and did not argue that the SCSO policies were relevant to her negligence theories pertaining to Deputy Pendergrass individually, the trial court did not abuse its discretion when

---

[13] To the extent that Sara makes additional arguments on appeal to support a finding of relevance, "'[w]e will not review an issue, theory, argument, or claim of error not presented at the trial court level.'" Ainsworth v. Progressive Cas. Ins. Co., 180 Wn. App. 52, 81, 322 P.3d 6 (2014) (alteration in original) (quoting Lindblad v. Boeing Co., 108 Wn. App. 198, 207, 31 P.3d 1 (2001)).

it excluded this evidence.

Second, the trial court excluded national and model policies and policies from other jurisdictions. To this end, Sara points to no authority—and we have found none—that supports the proposition that national or other policies are relevant to the standard of care or excessive force testimony. Cf. Amend v. Bell, 89 Wn.2d 124, 126, 130, 570 P.2d 138 (1977) (holding that *direct* evidence of the defendant's negligence was admissible when the defendant admitted to one instance of negligence and alleged comparative fault); cf. Meyers v. Meyers, 81 Wn.2d 533, 536-37, 503 P.2d 59 (1972) (holding that a general standard of care is not required where a Washington statute imposed a positive duty on notaries). Therefore, the trial court did not act manifestly unreasonable when it found that the evidence was irrelevant. See Scherf, 192 Wn.2d at 387 ("'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.'" (quoting In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). We conclude that the trial court did not abuse its discretion in excluding the testimony of the other policies.

CONCLUSION

The trial court did not err when it entered a directed verdict on Sara's negligence theories because the theories, as alleged and tried, required speculation on the part of the jury with regard to the element of cause in fact. However, the trial court erred when it entered a directed verdict with regard to Sara's battery claim. Therefore, we reverse in part and remand for trial on Sara's

battery claim.

WE CONCUR:

_Andrus, A.C.J._